# United States Court of Appeals
## For the First Circuit

No. 01-2197

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

FEDERICO VILLARMAN-OVIEDO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,

and Shadur,* Senior District Judge.

Marlene Gerdts for appellant.
Thomas F. Klumper, Assistant United States Attorney, with
Sonia I. Torres, Assistant United States Attorney, was on brief for
appellee.

March 21, 2003

---

*Of the Northern District of Illinois, sitting by designation.

**SHADUR, <u>Senior District Judge</u>.** Federico Villarman-Oviedo ("Villarman") brings this appeal to raise 16 different issues and errors that he claims necessitate either a new trial or reversal. We deny all of his claims of error, uphold the rulings of the district court and affirm his conviction and sentencing.

In a grand jury indictment returned on March 24, 1999, Villarman together with one or more of his 20 co-defendants were charged in five drug-related counts, including one count of conspiracy (1) to possess with intent to distribute and (2) to distribute five kilograms or more of cocaine, one kilogram of heroin and multi-pound quantities of marijuana. On April 4 Villarman was arraigned, entered a not guilty plea and was ordered detained pending trial. That indictment was superseded on April 21, and again Villarman was arraigned and ordered detained without bail on April 29. On May 5 the grand jury returned a two-count second superseding indictment against Villarman and 23 co-defendants. Then on May 13 he was again arraigned, again pleaded not guilty and continued to be detained.

On August 25 Villarman submitted an urgent motion requesting a de novo bail hearing. After conducting such a hearing on September 17, the district court denied Villarman's motion and approved the order for detention pending trial.

Ultimately (on April 18, 2000) the grand jury returned a four-count third superseding indictment against Villarman and eight

co-defendants.  Count One, the only count in which Villarman was named, charged:

> From on or about March, 1998 up to and including the date of this indictment, in the District of Puerto Rico and within the jurisdiction of this Court, [named defendants including Villarman], the defendants herein, and others to the Grand Jury known and unknown, knowingly, willfully, intentionally and unlawfully did conspire, confederate, and agree with each other and with other persons to the Grand Jury known and unknown, to knowingly, intentionally, and unlawfully possess with intent to distribute and distribute:
>
> > a. five (5) kilograms or more, the exact amount being unknown, of a mixture and substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance;
> >
> > b. one (1) kilogram or more, the exact amount being unknown, of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance; and
> >
> > c. multi-pound quantities, the exact amount being unknown, of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled substance.
>
> All in violation of Title 21, United States Code, Section 846.[1]

Villarman and other co-defendants then filed multiple motions to suppress evidence gathered from wiretaps or, in the alternative, for the conduct of a hearing under Franks v. Delaware,

---

[1] Further statutory citations will simply take the form "Section," omitting references to Title 21 and to Title 18, the general criminal code.  That dual usage should create no confusion, because the Title 21 references are in the 800 series, far removed from the Title 18 section numbers.

438 U.S. 154 (1978). Those motions call for backtracking somewhat in reviewing the chronology of the case.

On May 1, 1998, a wiretap application for cellular phones in Puerto Rico had been authorized by District Judge Daniel R. Dominguez of the District of Puerto Rico, based on the government's application and supporting affidavits. Information in the affidavits originated in a New York investigation into a drug conspiracy, which expanded to Puerto Rico when the government learned of telephone calls to New York narcotics distributors from a Puerto Rican cellular phone. In the wiretap application the government cited telephone toll records, criminal history records of the targets, undercover purchases of heroin in New York, conversations from wiretaps established in New York and information that the cellular phones continued to be operational. In addition the government described how traditional investigative techniques would not be effective in investigating the drug conspiracy within Puerto Rico because the targets tended to be highly suspicious.

On June 16, 2000 the district court found that there had been sufficient pre-wiretap investigation to justify denial of any suppression of the wiretap evidence. After describing some of that investigation, the district court found that the authorization of the wiretaps was reasonable because the nature of the conspiracy made it likely that routine investigatory techniques would fail.

In that same opinion the district court also considered how Villarman's allegations of perjury in the government's affidavit in support of the wiretap could impact the motion to suppress the evidence. According to Villarman, the affidavits had failed to disclose that the government had a confidential informant who was being debriefed by the government and had provided much of the information for the wiretap application. In addition, Villarman contended that the government should have informed issuing Judge Dominguez about testimony in front of another judge, Judge Aracelia Acevedo of the Puerto Rico Commonwealth Municipal Court. Two Drug Enforcement Administration ("DEA") Special Agents, Julie de Mello ("de Mello") and Iván Rios Grajales ("Grajales"), had given oral testimony under oath in connection with their request for an arrest warrant against two co-defendants in this case, Carlos Soto del Valle ("Soto") and Joaquín Cruz Jiménez ("Cruz"). De Mello and Grajales did not advise Judge Acevedo that they were conducting a federal investigation and that they had wiretap communications. Villarman cites Judge Acevedo's affidavit (describing how agents testified that they had received information about Soto's and Cruz' activities from a confidential informant) as evidence of perjury in the affidavit for the wiretap application, which declared there was no confidential informant who could assist in the investigation of the Puerto Rico conspiracy.

Finding that the alleged perjury was simply a misunderstanding by the state judge of the agents' use of the Spanish term "confidencia" (meaning only "confidential information," not a nonexistent Puerto-Rico-based confidential informant), a misunderstanding that was the product of a federal gag order forbidding reference to the wiretap (which had indeed provided the "confidential information"), the district court held that no illegal activity had occurred. Villarman's request for a <u>Franks</u> hearing to review the sufficiency of the evidence was also denied.

On October 10, 2000 the United States informed Villarman that it anticipated calling DEA Special Agent Reinaldo López ("López") to testify about factual matters and maybe as an expert witness. Villarman was also informed about López' background and experience, as well as the general context of his testimony. On October 12 Villarman submitted a motion to strike expert testimony, to which the government responded on October 13 and 16.

On October 15, 2000 the case against Villarman began, and the jury trial lasted nearly two weeks. During the trial the government presented its case through numerous witnesses, including López and cooperating witness Isaias Valerio ("Valerio"), as well as 16 intercepted phone calls that involved Villarman talking (1) to co-defendants Cruz and Soto (both individually and together)

and (2) to cooperating witness Valerio, using one of co-defendant Soto's cellular phones.

López presented testimony about general narcotics activities in Puerto Rico as well as interpreting coded language in the intercepted telephone calls. López had listened to over 5000 intercepted calls during the course of this investigation, as well as having many years of experience and training in narcotics investigations. Villarman made motions and interposed contemporaneous objections asking that López not be allowed to testify as to the content of the taped conversations because he was not certified as an expert, nor had he been a participant in the conversations. Finding that López was testifying to his personal experiences in listening to the tapes, the district court ruled that the testimony should be considered lay opinion testimony under Fed. R. Evid. ("Evid. Rule") 701, not expert testimony governed by Evid. Rule 702.

During the course of the trial, cooperating witness Valerio testified for the government about his relationship with Villarman and their narcotics distribution activity. Valerio discussed how he and Villarman had transported 300 to 350 kilograms of cocaine from Puerto Rico to New York between 1998 and 1999. Valerio also testified about how he and Villarman used coded words to discuss narcotics and also analyzed a taped conversation in which he and Villarman spoke about several kilograms of cocaine

that had gotten wet.  Valerio also discussed taped conversations between Villarman and other co-defendants in which wet cocaine was discussed.

During the trial Villarman moved for a mistrial, arguing that Valerio's testimony about the 300 to 350 kilogram cocaine transaction violated Evid. Rule 404(b).  In denying the motion, the district court determined that the conduct formed part of the charged conspiracy and was therefore not Evid. Rule 404(b) material.  Villarman later moved pursuant to Fed. R. Crim P. ("Crim. Rule") 29 for a judgment of acquittal, which the district court also denied.

Villarman testified at trial over a span of three days. Villarman admitted that it was his voice in the taped conversations and that he had spoken to co-defendants Soto and Cruz about obtaining cocaine for them.  He also admitted to using coded terms to discuss drug transactions, but he denied that he ever really agreed or intended to provide narcotics.  After his testimony Villarman again unsuccessfully argued for a judgment of acquittal.

On October 27, 2000 the jury returned a verdict of guilty as to Villarman with respect to Count One of the third superseding indictment.  By a special jury verdict, the jury found Villarman guilty of conspiracy to distribute more than one kilogram of heroin, but it found that he had not engaged in a conspiracy to distribute any amounts of cocaine or marijuana.

On May 11, 2001 the Presentence Investigative Report ("PSI") was released. Under Sentencing Guideline ("U.S.S.G.") §2D1.1 the PSI recommended a base offense level of 32, then added a two-level enhancement for obstruction of justice, for a total offense level of 34. No recommendation for a downward adjustment for acceptance of responsibility was included. Both the United States and Villarman submitted motions objecting to the PSI, with Villarman's objections including (1) a request for a downward departure for his allegedly minor role in the conspiracy, (2) a dispute over discrepancies between the amount of heroin found by the special jury verdict and the testimony presented at trial, (3) a complaint about the failure to acknowledge Villarman's acceptance of responsibility and (4) an objection to the inclusion of a sentencing enhancement for obstruction of justice. Villarman also asked that the Court apply the holding in Apprendi v. New Jersey, 530 U.S. 466 (2000) to the indictment and the special jury verdict.

On July 17, 2001 the district court adopted the factual findings of the PSI, determined a total offense level of 34 and sentenced Villarman to imprisonment for 151 months, followed by a five-year term of supervised release. Villarman filed motions for new trial and judgment of acquittal under Crim. Rule 29 on the same day, and on July 20 he filed a notice of appeal. On August 27 the district court denied Villarman's motions, and on October 18

Villarman submitted an urgent motion for new trial that was again denied by the district court.

We turn then to Villarman's numerous issues on appeal. Some merit only short shrift, while others call for more extended treatment.

### Denial of Bail Pending Trial

Villarman claims that the district court erred in denying him pretrial bail. We ordinarily apply an "independent review, tempered by a degree of deference to the determinations made below" to the district court's pretrial detention order under Section 3145 (United States v. Tortora, 922 F.2d 880, 882-83 (1st Cir. 1990)). But because Murphy v. Hunt, 455 U.S. 478, 481-84 (1982)(per curiam) teaches that a defendant's claim to pretrial bail becomes moot once he is convicted, Villarman's like claim is moot.

### Title III Wiretaps

Villarman contends that the district court erred in denying his motion to suppress all conversations obtained by Title III wiretaps and in refusing to conduct a Franks evidentiary hearing before it denied that motion. Villarman relies on what he describes as "perjured statements, omissions, factual inadequacies and misrepresentations by the government in the applications for the original electronic surveillance and its extensions." Villarman claims (1) that it was unnecessary to have a wiretap because of the availability of less intrusive techniques and (2)

that the affidavit in support of the wiretap was tainted by misleading and false statements and material omissions.

On the first issue Villarman disputes that the government provided "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" ("Title III," Section 2518(1)(c)). We have interpreted that provision to mean that the statement should demonstrate that the government has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls" (United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)). Before granting a wiretap authorization the issuing court "must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence--to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable" (United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986)). It is not necessary, though, to show that other methods have been entirely unsuccessful (id.).

Decisions to grant wiretap orders are subject to review in two different contexts. First the trial judge may consider a motion to suppress the evidence gathered by the wiretap that the issuing judge authorized, while later an appellate court may review

-11-

the trial judge's suppression ruling (see United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989), most recently followed in United States v. Nelson, 319 F.3d 12, 32 (1st Cir. 2002)). In both instances the reviewing court examines the face of the affidavit and "decide[s] if the facts set forth in the application were minimally adequate to support the determination that was made" (Ashley, 876 F.2d at 1074).

Here the affidavit provided to issuing Judge Dominguez contained a detailed description of the evidence the investigation had collected to date, including telephone toll records, background and criminal history of targets, undercover purchases of heroin in New York, telephone conversations from wiretaps in New York and information from the Puerto Rico telephone company that the telephones were operational. In addition, the affidavit explained why the continued use of traditional investigative techniques (such as confidential sources, grand jury subpoenas, search warrants, surveillance and consensual monitoring) would be ineffective in uncovering the full scope of the potential crimes under investigation, as well as the identities of those responsible for the unlawful manufacture, possession, sale and distribution of narcotics in Puerto Rico. And the affidavit also included a description of the investigation's goal of obtaining evidence of the totality of offenses in which the targets of the investigation were involved.

Against all of that, Villarman claims that the government had failed to investigate thoroughly in Puerto Rico, so there were other methods of investigation that should have been pursued before resorting to the wiretap under Section 2518(1)(c). Moreover, he plumps for suppression because of nondisclosure to the issuing judge about how far the New York investigation had proceeded and about the fact that a confidential informant was the source of much of the information presented in the application. According to Villarman, if the issuing judge had been told how far the government had progressed without the wiretap, he would not have given his approval for the wiretap.

Title III does require that the affidavit show why wiretapping is necessary in place of less intrusive investigative techniques. From the facts provided to him in the affidavit, the district court here found that normal investigative techniques had been tried in Puerto Rico, but had failed. Separate electronic surveillance had been authorized by a New York court and had resulted in traced calls to and from three telephones owned by a co-defendant. Additionally, another co-defendant was under physical surveillance in Puerto Rico, and agents had attempted surveillance in the vicinity of the homes of two co-defendants.

According to the affidavit, the surveillance and other techniques failed because the co-defendants were very suspicious of potential surveillance and the surveillance would be easily detected

in the co-defendants' neighborhood. Moreover, such typical investigatory methods as grand jury subpoenas, search warrants and pen registers were insufficient to gather information without alerting the co-conspirators to the surveillance and potential criminal liability.

Finally, the affidavit also asserted an inability to infiltrate the drug trafficking organization because there were no confidential informants who had knowledge of the organization or who could introduce agents to members of the organization. Even though a New York confidential informant had enabled the agents to identify some of the main co-conspirators, that informant lacked sufficient contacts to develop information about the structure of the organization in Puerto Rico. Moreover, the lack of a confidential source in Puerto Rico made it difficult to establish consensual monitoring. In light of that detailed explanation, the affidavit's discussion of alternate methods plainly does not fall below the standard of adequacy for a wiretap (see United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002)). With the government still unaware of the identity of many of the conspiracy's members as well as the organizational structure of the conspiracy, the district court could permissibly allow the government to employ electronic surveillance to uncover the complete range of operations of the target conspiracy.

Villarman seeks to undercut that conclusion by also arguing that the affidavit was tainted by misleading and false statements and material omissions in violation of the government's responsibility under Section 2518(1)(c). Villarman claims that those omissions amount to perjury, especially in the area of whether or not the government had a confidential informant in Puerto Rico able to assist in investigating the drug conspiracy.

We need not lengthen this opinion by addressing Villarman's numerous theories of how the government assertedly failed to make a complete and honest statement of facts. We have examined them carefully just as the district judge did (United States v. Soto-Del Valle, 102 F. Supp. 2d 57 (D. P.R. 2000)), and we too find them without merit. Moreover, they are totally inadequate to have required a Franks hearing under the standards we have announced in such cases as United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000) and United States v. Adams, 305 F.3d 30, 36 n.1 (1st Cir. 2002). It is an understatement to say that the district court's rejection of the need for a Franks hearing was not clearly erroneous, the standard announced in such cases as United States v. Ranney, 298 F.3d 74, 77-78 (1st Cir. 2002).

In sum, the district court's allowance of the Article III wiretaps was entirely proper. We turn to Villarman's other arguments.

<u>Evid. Rule 404(b)</u>

We review a district court's admission of evidence that is allegedly Evid. Rule 404(b) material under an abuse of discretion standard (<u>United States</u> v. <u>Manning</u>, 79 F.3d 212, 217-18 (1st Cir. 1996)). Because here the challenged evidence is not of "other crimes, wrongs, or acts" (the language of the Rule), but is rather intrinsic to the crime charged in the indictment (<u>id</u>. at 218), the standard of review becomes irrelevant: Evid. Rule 404(b) is really not implicated at all (<u>United States</u> v. <u>Shea</u>, 159 F.3d 37, 39 (1st Cir. 1998)).

Thus Villarman complains of the testimony of cooperating witness Valerio about his alleged involvement with Villarman in several cocaine distribution transactions involving 300 to 350 kilograms of cocaine between 1998 and 1999. Although other evidence at trial as well as the eventual verdict against Villarman focused on heroin transactions, the district court found that the evidence as to cocaine was not Evid. Rule 404(b) material because it formed part of the charged indictment, in addition to which there was no contemporaneous objection by Villarman's counsel.

Count One, on which Villarman was convicted, charged him and his co-defendants with conspiracy to distribute and possess cocaine, heroin and marijuana from on or about March 1998 up to and including the date of the third superseding indictment (April 18, 2000). In addition to the challenged testimony, the jury heard

taped conversations in which Valerio and Villarman discussed still another cocaine transaction. We cannot say that the district court abused its discretion in finding that Valerio's testimony at issue was direct evidence of the conspiracy charged, rather than evidence of other bad acts subject to Evid. Rule 404(b).[2]

Villarman also argues that the "District Court failed to carefully balance the probative value, if any of the proffered testimony" under Evid. Rule 403. But "[b]alancing these concerns lies within the broad discretion of the trial Judge and will only be reversed upon a showing that the Judge abused his discretion" (United States v. Andiarena, 823 F.2d 673, 677-78 (1st Cir. 1987)). Again no abuse of discretion has been shown here.

## Single Conspiracy v. Multiple Conspiracies

Villarman also complains that a variance exists between the single conspiracy charged and multiple conspiracies presented at trial. That poses the issue succinctly described in United States v. Escobar-de Jesus, 187 F.3d 148, 172 (1st Cir. 1999):

> A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment.

Such a variance requires reversal only if it "is both material and prejudicial, for example, if the variance works a substantial interference with the defendant's right to be informed of the

---

[2] That being so, we need not determine whether Villarman made a contemporaneous objection to Valerio's testimony so as to impose a more demanding standard on Villarman's current contention.

-17-

charges laid at his doorstep" (id.).  Here Villarman argues that even though the indictment charged only a single conspiracy, the proofs at trial focused on multiple conspiracies that were different with respect to the co-conspirators, the time frame of alleged activity and the transactions themselves.

That issue of single conspiracy v. multiple conspiracies is a question of fact for the jury (United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999)).  As United States v. Portela, 167 F.3d 687, 696 (1st Cir. 1999) has reiterated:

> The question whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency.

Throughout trial the government presented evidence supporting the theory of a single conspiracy as described in the indictment.  There were telephone calls between Villarman and co-defendants Soto and Cruz discussing both heroin and cocaine transactions.  Valerio also explained a drug transaction that he had discussed with Villarman, once when Villarman was using co-defendant Soto's cellular phone.  Villarman himself testified at trial and admitted that he spoke to co-defendants Soto and Cruz about providing cocaine, occasionally in coded language.  All of that evidence would suffice for a jury determination that Villarman was involved in a single conspiracy, including among its members Valerio and co-defendants Soto and Cruz, to distribute narcotics.

-18-

Indeed, even if there had been a variance (as there was not), Villarman would still have to show that it had produced unfair prejudice and that it was not "harmless error" (<u>United States</u> v. <u>Candelaria-Silva</u>, 166 F.3d 19, 39 (1st Cir. 1999)).  Because the jury found Villarman guilty only of heroin involvement and not of cocaine dealing, it apparently did not rely on Valerio's testimony as to 300 to 350 kilograms of cocaine, looking instead to the tape-recorded conversations of Villarman discussing heroin transactions.  So even at worst, Villarman's contention of a variance would constitute harmless error and would thus be insufficient to warrant reversal.

### Testimony by Special Agent López

Next Villarman argues that the district court erred in allowing Special Agent López to provide expert testimony without prior notice, assertedly depriving Villarman of the opportunity to retain his own experts to refute the testimony.  Looking to Evid. Rule 701 as the predicate for doing so, the district court allowed López to testify about the conspirators' use of coded terms to denote drugs and about the meaning of those terms.  Then Villarman, electing to testify during the week following López' testimony, took that opportunity by acknowledging the use of code words but by stating that "bread" denoted cocaine and not (as López had testified) heroin.  That of course presented a classic occasion for the jury's determination of credibility, which the jury permissibly

resolved when it found Villarman guilty of participation in a heroin conspiracy but not a cocaine conspiracy.

Under the circumstances here, it is unnecessary for us to decide whether the district court was or was not right in characterizing López' testimony as lay testimony under Evid. Rule 701 rather than as expert testimony under Evid. Rule 702 (in the latter respect, see, e.g., <u>Kumho Tire Co.</u> v. <u>Carmichael</u>, 526 U.S. 137 (1999) and the implementing December 1, 2000 amendments to Evid. Rules 701 and 702). That is so because López was clearly qualified by experience and the "specialized knowledge" that he had acquired over the years to opine on the meaning of the code words that had admittedly been used by Villarman and others (see, e.g., <u>United States</u> v. <u>Tejada</u>, 886 F.2d 483, 485-86 (1st Cir. 1989), and because the government's October 11, 2000 discovery letter gave ample notice of that specialized knowledge to Villarman. In short, Villarman loses this argument too.

### <u>Brady</u>, <u>Giglio</u> and the Jencks Act

Villarman further charges that the district court erred in allowing Valerio to testify because the government assertedly did not comply with its discovery obligations. According to Villarman, the government's asserted failures to disclose (1) Valerio's identity as a witness, (2) his plea and cooperation agreement, (3) reports of his debriefings, (4) his criminal history and (5) any other impeachment material violated <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83

-20-

(1963), <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150 (1972) and Section 3500 (the Jencks Act). Villarman claims that he was deprived of the opportunity to use the withheld evidence (a) to conduct investigation and obtain further discovery, (b) to aid adequately in the formulation of his defense and (c) to impeach the witnesses against him during trial.

As to those claims, the issue is one of assertedly delayed disclosure rather than nondisclosure. Villarman received a copy of Valerio's plea and cooperation agreement, with nonmaterial redactions, four days before trial. And for <u>Brady</u>-<u>Giglio</u> purposes, <u>United States</u> v. <u>Catano</u>, 65 F.3d 219, 227 (1st Cir. 1995) teaches the application of an abuse of discretion standard, for purposes of which <u>Catano</u>, <u>id</u>. repeats "the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." Relatedly, Congress has prescribed the defendant's ability to conduct effective cross-examination as the Jencks Act standard.

Here Villarman did employ the relevant material--whether assertedly exculpatory as to Villarman or impeaching as to Valerio or both--during the Valerio cross-examination (as was done in <u>United States</u> v. <u>Valencia-Lucena</u>, 925 F.2d 506, 514 (1st Cir. 1991)). And as to the claimed inadequacy of that use, another branch of Villarman's complaints, he has not pointed credibly to specific objections that he might have lodged (but let pass), or to

particular arguments that he might have advanced (but did not), if he had received the information earlier. As United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990) says:

> A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed.

Indeed, no better demonstration of the adequacy of the use of the material provided to Villarman could be made than the actual result at trial:  Valerio testified only about cocaine transactions with Villarman, and by special verdict the jury found Villarman not guilty of cocaine distribution.

### Right of Confrontation

Again dwelling on the Valerio testimony, Villarman claims that the district court prevented him, in violation of his Sixth Amendment rights, from cross-examining Valerio effectively. Although that added contention could also be dispatched swiftly in terms of the result reached at the end of the preceding section, Villarman also loses that claim analytically.

Confrontation Clause challenges are reviewed de novo to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses.  But when that threshold is reached, any constraints imposed by the trial court on the extent and manner of cross-examination are reviewed only for abuse of discretion (United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st

-22-

Cir. 2000)). On that score <u>Stephens</u> v. <u>Hall</u>, 294 F.3d 210, 226 (1st Cir. 2002)(citations and quotation marks omitted, emphasis in original) sets forth the relevant standard:

> In order to safeguard the defendant's rights under the Confrontation Clause, we have held that the trial judge may not so restrict cross-examination as to deprive the defendant of the constitutionally required threshold level of inquiry, and must give the accused sufficient leeway to establish a reasonably complete picture of the witness's veracity, bias, and motivation.
>
> *          *          *
>
> [T]he Confrontation Clause guarantees an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

In this instance the district court curbed Villarman's cross-examination of Valerio as inappropriate on just three occasions: (1) when Villarman attempted to use a version of facts attached to Valerio's plea and cooperation agreement when that guilty plea was unrelated to this case, (2) when Villarman accused Valerio of violating his cooperation agreement by allegedly soliciting information from other defendants and (3) when Villarman asked Valerio about his citizenship and place of birth. Before us Villarman has failed to address any of those instances, but in any event our reading of the trial transcript discloses that the district court did not abuse its discretion in any of those respects.

Instead Villarman simply repeats his nondisclosure (or delayed disclosure) contention that we have just rejected in terms

of <u>Brady</u>-<u>Giglio</u> and the Jencks Act, attempting to transmute that into a violation of his Sixth Amendment right to confront witnesses. Because the argument does not gain force either through repetition or by wrapping it in a new garment, we reject it again for the same reasons.

### Motion for Mistrial

In still another effort to ring changes on the same bells of Valerio's testimony, Villarman urges that allowing that witness to testify about 300 to 350 kilograms of cocaine deprived Villarman of an opportunity to investigate the veracity and nature of--and thus to defend against--that testimony, so that a mistrial should be declared for the asserted violation of Evid. Rule 404(b). Any refusal to declare a mistrial is measured against a manifest abuse of discretion yardstick, so that we will uphold the court's ruling unless the movant demonstrates a clear showing of prejudice (<u>United States</u> v. <u>Rullan-Rivera</u>, 60 F.3d 16, 18 (1st Cir. 1995)).

What we have said earlier on the subject of Evid. Rule 404(b) defeats Villarman on this score as well. Every step in that analysis applies here with equal force, and the standard of review here is even more demanding.

### Motion for New Trial

We deal next with Villarman's assertion that the district court erred in denying his motion for new trial because the evidence presented at trial by the government did not justify the jury's

-24-

special verdict finding him responsible for more than one kilogram of heroin. That decision is reviewed in manifest-abuse-of-discretion terms (United States v. Rodriguez-DeJesus, 202 F.3d 482, 485 (1st Cir. 2000)) in light of Crim. Rule 33, which authorizes the grant of a new trial if required in the interests of justice and "where the evidence preponderates heavily against the verdict" (United States v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996)).

During the trial Special Agent López testified about two specific transactions, each involving one-eighth kilogram of heroin. As Villarman would have it, the jury could look only to that evidence and therefore convict him for no more than that quantity. But that contention glosses over the fact that López also testified about another attempted transaction that involved two kilograms of heroin (with the drug reference sought to be disguised by the use of coded words). Because that evidence too could be credited by the jury to support its special verdict of more than one kilogram of heroin, the district court did not abuse its discretion in denying Villarman's Crim. Rule 33 motion.

Villarman next argues that the district court erred in denying his Crim. Rule 29 motion for a new trial because the evidence did not support the special verdict in which the jury found him guilty of conspiracy with intent to distribute more than one kilogram of heroin. Denial of a Crim. Rule 29 motion for judgment of acquittal is reviewed de novo, and we will affirm Villarman's

-25-

conviction if after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (<u>United States</u> v. <u>Donnat</u>, 311 F.3d 99, 103 (1st Cir. 2002)).

As we have just said in the preceding section, López testified about transactions totaling 2-2/8 kilograms of heroin. All credibility determinations are left for resolution by the jury for Crim. Rule 29 purposes (<u>United States</u> v. <u>Hernandez</u>, 146 F.3d 30, 32 (1st Cir. 1998)).  And that scotches Villarman's claim to a judgment of acquittal for any asserted insufficiency of the evidence.

### Calculation of Drug Quantity for Sentencing Purposes

Just as the jury's determination of the quantity of heroin involved has withstood attack, so too does the district judge's sentencing determination of Villarman's U.S.S.G. base offense level as 34.  U.S.S.G. findings of the sentencing court are overturned only for clear error (<u>United States</u> v. <u>Zuleta-Alvarez</u>, 922 F.2d 33, 37 (1st Cir. 1990)), and that cannot be said as to the offense level in this case, based as it was on at least one but not more than three kilograms of heroin.

### Other Sentencing Issues

Villarman advances three other sentencing issues:  (1) that the district court erred in granting a two-level increase under U.S.S.G. §3C1.1 for obstruction of justice because, he says, there was no

specific reliable evidence that Villarman gave material false testimony at trial; (2) that the district court erred in not granting his motion for a two-level downward departure based on his minor role in the conspiracy; and (3) that the district court engaged in a lack of parity in sentencing Villarman to a longer term than other co-defendants.[3] We deal with those contentions in turn.

As to the first of those issues, whether Villarman's conduct is within the scope of U.S.S.G. §3C1.1 is subject to de novo review, but fact-bound determinations are reviewed for clear error (United States v. Thomas, 86 F.3d 263, 263 (1st Cir. 1996)(per curiam)). In the latter respect, if the record supports at least two permissible inferences, the factfinder's choice between or among them cannot be clearly erroneous (United States v. Veilleux, 949 F.2d 522, 525 (1st Cir. 1991)).

U.S.S.G. §3C1.1 requires the imposition of a two-level increase in offense level if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of [an] offense." For a defendant's perjury to support

---

[3] Although Villarman's initial brief also indicates, in the title to the subsection discussing these issues, that the district court erred in "failing to grant a downward departure for acceptance of responsibility," there is no discussion of any such contention in the text of that brief or of his reply brief. Even if that argument had been presented, however, Villarman's continued denial that he conspired to distribute narcotics justifies the district court's refusal to grant him credit for acceptance of responsibility.

such an enhancement, he or she must have provided "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory" (United States v. Rowe, 202 F.3d 37, 43 (1st Cir. 2000)).

At trial Villarman acknowledged numerous telephone conversations with co-defendants about providing drugs, but he claimed that he never agreed to provide or intended to provide them with any type of drug. Instead Villarman said that he spoke with the co-defendants only because he was owed money and feared for his life. If that testimony had been believed, the jury would consequently have concluded that he did not intend to distribute drugs, rendering him guiltless of any conspiracy to distribute narcotics. In reaching the opposite conclusion as to his guilt beyond a reasonable doubt regarding a heroin conspiracy, the jury must perforce have determined that Villarman's testimony was false--not the product of mistake, confusion or faulty memory, but rather stemming from Villarman's desire to convince the jury of a fabricated theory to excuse himself from liability. In turn, the district court could not have been clearly erroneous in deciding that Villarman had provided materially false information, thus justifying the two-level increase for obstruction of justice.

As for Villarman's role in the conspiracy, U.S.S.G. §3B1.2(b)'s cmt. 5 identifies a minor participant as one "who is

less culpable than most other defendants, but whose role could not be described as minimal." We will reverse a sentencing court's finding that a defendant is not a minor participant only if it is clearly erroneous (United States v. Ortiz-Santiago, 211 F.3d 146, 148-49 (1st Cir. 2000)), so that the defendant bears a substantial burden of proving entitlement to such a downward adjustment for his or her role in the offense (id. at 148). As United States v. Brandon, 17 F.3d 409, 460 (1st Cir. 1994) has put it:

> The sentencing court has broad discretion in determining whether this downward departure is appropriate and we will reverse only if the evidence overwhelmingly demonstrates that the defendant played a part that makes him substantially less culpable than the average participant such that the court's decision was clearly erroneous.

Villarman fails that test. He discussed with his co-conspirators not only the sale of drugs but also the need to find people to transport those drugs. Importantly, Villarman also supplied co-defendant Cruz with heroin and expressed worry about the loss of two kilograms of heroin transported by the conspiracy. Even without regard to Valerio's testimony about Villarman's asserted role in transporting 300 to 350 kilograms of cocaine, Villarman plainly has not shown clear error in the district court's determination that he was not a minor participant in the conspiracy to distribute more than one kilogram of heroin.

Finally as to the comparative length of Villarman's custodial sentence, the district judge imposed a term of 151 months'

-29-

imprisonment, longer than the 121-month term imposed on each of co-defendants Soto and Cruz. But Villarman cannot complain on that ground, because a court cannot depart from the U.S.S.G. just to correct an asserted disparity in the sentencing of co-conspirators (Ortiz-Santiago, 211 F.3d at 150).

In this case Villarman's U.S.S.G. calculation was predicated on a very different situation from that of his co-defendants. Both Soto and Cruz pleaded guilty and otherwise qualified for a three level reduction in their offense levels under U.S.S.G. §3E1.1. By contrast, the district court properly determined that Villarman was not entitled to a like reduction for acceptance of responsibility. And relatedly (for the U.S.S.G. teach a customary linkage between these factors, see U.S.S.G. §3E1.1's cmt. 4), we have already upheld the district court's appraisal of Villarman's testimony as justifying an enhancement for obstruction of justice. In sum, the asserted disparity in sentencing vanishes because it was entirely the product of appropriate applications of the U.S.S.G.

## Apprendi Considerations

Villarman's penultimate objections stem from his counsel's view of the fallout from the Supreme Court's decision in Apprendi. Neither of those objections withstands analysis.

For one thing, Villarman contends that clear error was involved in sentencing Villarman without having the jury specify the

type and quantity of drug, the enhancement for obstruction of justice and Villarman's role in the offense. Villarman seeks to invoke Apprendi to urge that those factors must be determined by a jury and not by the sentencing judge.

Apprendi's applicability as a question of law is reviewed de novo (United States v. Chemetco, Inc., 274 F.3d 1154, 1158 (7th Cir. 2001); United States v. Candelario, 240 F.3d 1300, 1306 (11th Cir. 2000)). This Circuit has already addressed and rejected this first Apprendi argument in United States v. Collazo-Aponte, 281 F.3d 320, 324 (1st Cir. 2002)(citations and quotation marks omitted):

> We have consistently held that the Apprendi doctrine does not apply to defendants who are sentenced to terms less than the otherwise applicable statutory maximum. Most succinctly, Apprendi does not require that all sentencing factors be submitted to the jury and proven beyond a reasonable doubt, rather only those that increase the penalty for a crime beyond the prescribed statutory maximum.

In this instance the combined effect of Sections 841(a)(1), 841 (b)(1)(C) and 846 is that Villarman's adjudicated guilt of a conspiracy to distribute heroin sets a maximum statutory penalty of 20 years' imprisonment (it will be recalled that the jury's special verdict found him guilty beyond a reasonable doubt of a drug conspiracy involving more than one kilogram of heroin). Villarman's actual custodial sentence of 151 months is more than seven years below the 20-year statutory maximum that would apply if the jury had failed to identify any specific amount of heroin. Enough said.

-31-

Villarman's other Apprendi-premised argument is that his conviction should be vacated because the statute under which he was convicted (Section 846), when combined with the sentencing factors under Section 841, is unconstitutional in light of Apprendi. But here too this Circuit has found that same argument wanting, this time in Collazo-Aponte, 281 F.3d at 325. We adhere of course to that decision.

Villarman concludes with the kitchen-sink contention that the cumulative effect of the putative errors already discussed in this opinion operated to violate his constitutional right to a fair trial. We have already shown that few of the matters to which Villarman points may fairly be labeled as errors--even harmless ones. And even as to those, the familiar teaching of Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) is that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993) concluded a like review of a laundry list of purported trial court errors with this explanation:

> Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as whole, paying particular weight to factors such as the nature and number of errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy--or lack of efficacy--of any remedial efforts); and the strength of the government's case.

We have engaged in just such a review, and it mandates the denial of Villarman's claim of cumulative error as well.

Conclusion

We AFFIRM Villarman's conviction and sentence.