2022 UT App 134

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SADAT AHMED HEBEISHY,
Appellant.

Opinion
No. 20200463-CA
Filed December 8, 2022

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 161900099

Emily Adams and Benjamin Miller, Attorneys
for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUSTICE JILL M. POHLMAN authored this Opinion, in which JUDGE
GREGORY K. ORME and JUSTICE DIANA HAGEN concurred.[1]

POHLMAN, Justice:

¶1 Sadat Ahmed Hebeishy entered a conditional guilty plea to one count of pattern of unlawful activity, reserving his right to appeal the district court's denial of his motion to suppress evidence obtained through two wiretaps. He now appeals, arguing that the wiretap applications failed to meet the necessity

---

1. Justices Jill M. Pohlman and Diana Hagen began their work on this case as members of the Utah Court of Appeals. They both became members of the Utah Supreme Court thereafter and completed their work on this case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

requirement of section 77-23a-10(1)(c) of Utah's Interception of Communications Act. We affirm.[2]

BACKGROUND

¶2     The Titanic Crip Society (TCS) is a small criminal street gang that has been operating in Weber County, Utah, since at least the 1990s. In 2015, law enforcement observed an increase in the number of crimes being committed by members of TCS and that the gang was recruiting juveniles who were participating "in fairly serious criminal offenses." Within a few months, an officer (Officer) of the Ogden Police Department who was assigned to the FBI's Safe Street Gang Unit Task Force began investigating TCS. As part of his investigation, Officer reviewed police reports, photographs, audio recordings, witness statements, and interview notes.

¶3     Officer's investigation revealed that TCS's organization is made up of "big homies and little homies." Big homies are the "shot callers" who "manag[e] the affairs of the gang" while taking "a hands-off approach" to the criminal conduct. The big homies direct the little homies in "their behavior and their conduct within the organization," and the big homies utilize the little homies "to recruit actively and often." Officer identified Sadat[3] and his brother, Tamer Hebeishy, as big homies within TCS.

---

2. This case is a companion case to *State v. Pickett*, 2022 UT App 135, and *State v. Tamer Hebeishy*, 2022 UT App 136, both of which also issue today.

3. Because Tamer and Sadat Hebeishy share the same last name, we refer to them by their first names, with no disrespect intended by the apparent informality.

*The First Wiretap – Tamer's Mobile Phone*

¶4    In November 2015, Officer applied for a wiretap warrant on Tamer's mobile phone. In a 180-page affidavit supporting the application, Officer identified three investigatory objectives of the wiretap: (1) to document and confirm the identities of TCS members, including those in positions of management; (2) to "[d]issolve or . . . severely disrupt" TCS's criminal operations; and (3) to obtain "gang-specific intelligence" to aid in "preventing, managing, or suppressing future criminal behavior(s)." In the affidavit, Officer asserted that the wiretap was "necessary" because of the difficulty in dismantling a gang with TCS's organizational structure. He explained: "There is a recurring theme which suggests TCS shot callers, including Tamer and Sadat Hebeishy, encourage and direct the criminal behavior of younger (often juvenile) and subordinate members. Thus, the shot callers mitigate their own risk of incarceration. This makes the dismantlement of the organization a difficult task, as the gang's leaders are free to repetitively recruit, groom, and manipulate new and impressionable members." (Cleaned up.)

¶5    Officer also detailed nearly twenty years of criminal activity documented in police records, analyzed phone recordings from the Weber County Jail, described evidence obtained from previously seized mobile phones belonging to other TCS members, and discussed an interview with Tamer and Sadat's brother, Sharif Hebeishy. Officer further explained that "traditional investigatory methods have failed to realize the dissolution of [TCS]" and that "those traditional methods which have not been attempted are either unpractical, too dangerous, or unlikely to result in the procurement of evidence to prosecute fully the participants who engage in criminal conduct on behalf and for the benefit of [TCS]." He then detailed the ineffectiveness of eight investigatory techniques: physical surveillance, knock

and talks,[4] undercover or covert operations, confidential informants, trash covers,[5] controlled buys, searches and search warrants, and pen registers.[6]

¶6     The district court authorized the wiretap of Tamer's mobile phone on November 13, 2015. It found "probable cause to believe that . . . [Tamer] and others" had and would continue to commit crimes, and "probable cause to believe that particular communications concerning [those crimes would] . . . be obtained through" a wiretap of Tamer's phone. The court also determined that "normal investigative procedures ha[d] been tried and failed," were "unlikely to succeed," or were "too dangerous" based on "the specified objectives of this criminal investigation." Thus, the court concluded that the wiretap was "necessary to achieve the listed objectives of this criminal investigation."

¶7     Four days after the wiretap was approved, Tamer's phone was intercepted. Interception continued until the middle of January 2016 pursuant to two orders extending the duration of the initial wiretap.

---

4. Officer explained in his affidavits that a "knock and talk" is "a commonly used expression" used by law enforcement "to describe an investigative technique in which officers make contact with suspected criminal offenders at their place(s) of residence."

5. According to Officer, a "trash cover" is "a specialized technique utilized by law enforcement" that "includes the covert procurement and examination of the garbage which is abandoned by the owners of a private residence."

6. A "pen register" is "a device that records or decodes electronic or other impulses that identify the numbers dialed or otherwise transmitted on the telephone line to which the device is attached." Utah Code Ann. § 77-23a-3(14) (LexisNexis 2017).

*The Second Wiretap – Sadat's Mobile Phone*

¶8     In December 2015, Officer applied for a wiretap warrant on Sadat's mobile phone. Officer's supporting affidavit was substantially similar to his affidavit in support of the wiretap on Tamer's mobile phone, but there were a few differences. In addition to identifying the same overall investigatory objectives, Officer explained that an additional objective of the second wiretap was to identify Sadat's "specific role" within TCS and to determine "his individual rights and/or responsibilities . . . as one of the gang's primary managers." Officer also explained that law enforcement had recently utilized other traditional techniques to investigate Sadat, including installing an electronic monitoring device on his vehicle, conducting physical surveillance at his residence, and collecting trash from a garbage can in front of that residence. Those techniques, however, failed to yield the evidence needed to achieve law enforcement's goal of acquiring evidence of Sadat's "position and influence" within TCS. Finally, the affidavit contained a thirteen-page section on necessity similar to that included in Officer's first affidavit, detailing other investigatory techniques that had been tried and failed, were not likely to succeed, or were too dangerous. The district court authorized the wiretap.[7]

¶9     Sadat's mobile phone was intercepted beginning in December 2015 and continuing through January 2016.

*The Motion to Suppress*

¶10     Several months after collecting evidence through the wiretaps, the State brought charges against Sadat and five other

---

7. The district court's order authorizing the wiretap on Sadat's mobile phone is not in the record, but the parties agree that the wiretap was authorized and neither contends that the order's absence from the record inhibits our ability to resolve this appeal.

TCS co-defendants (including Tamer). Sadat was charged with one count of pattern of unlawful activity with gang enhancement and one count of possession of a dangerous weapon by a restricted person. Prior to trial, Sadat filed a motion to suppress the evidence obtained from the wiretaps. He argued, in part, that Officer's wiretap applications failed to show necessity because Officer did not personally "attempt[]" or "seriously consider[]" several traditional investigatory techniques before seeking the wiretaps and because his affidavits were based mostly on "generalities and conclusory statements" about the ineffectiveness of those techniques.

¶11 After briefing and oral argument, the motion was denied. The district court rejected Sadat's argument that the affidavits were conclusory and lacked supporting facts, and it found that Officer "described law enforcement techniques that had been tried and failed, were not likely to succeed, or [were] too dangerous to try." Specifically, the court found that Officer "explained with factual information how surveillance, jail phone calls, witness interviews, search warrants, trash runs, confidential informants or undercover informants, and pen register-type information had been obtained and failed to fully identify and stop the leaders and members of TCS from the commission of criminal activity" and why those investigative techniques "were not likely to succeed if tried again" or were "too dangerous to try." And based on those findings, the court determined that the necessity requirement of Utah's Interception of Communications Act had been satisfied and that Sadat had failed to demonstrate that the evidence obtained from the wiretaps should be suppressed.

¶12 Sadat subsequently entered a conditional guilty plea to one count of pattern of unlawful activity, reserving his right to appeal the district court's ruling on his motion to suppress. Sadat now appeals.

ISSUE AND STANDARD OF REVIEW

¶13   Sadat contends that the district court erred in denying his motion to suppress evidence obtained through the two wiretaps. More specifically, Sadat contends that the court incorrectly determined that law enforcement had satisfied the necessity requirement of Utah's Interception of Communications Act.

¶14   The parties disagree over what standard of review applies to this question.[8] Relying on the standard traditionally applied to the review of denials of motions to suppress based on violations of the Fourth Amendment, Sadat argues that we should review this issue as a mixed question of law and fact, reviewing the district court's factual findings for clear error but affording no deference to the district court's necessity determination. The State, in contrast, invites us to review the district court's necessity determination for an abuse of discretion, contending that we should adopt the standard applied by the majority of federal appeals courts in reviewing necessity determinations under the federal wiretap statute. *See United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002) (collecting cases). We need not resolve this dispute because, even reviewing the district court's necessity determination for correctness as urged by Sadat, we discern no error by the district court.

ANALYSIS

¶15   The district court denied Sadat's motion to suppress, concluding that Officer's applications demonstrated the necessity required for the authorization of wiretaps of Tamer's and Sadat's

---

8. Utah appellate courts have yet to address the necessity requirement in Utah's Interception of Communications Act and thus have had no occasion to articulate the appropriate standard of review.

mobile phones. Sadat challenges the court's conclusion, arguing that Officer failed to show that other more traditional investigative procedures had been tried and failed or that other investigative procedures reasonably appeared unlikely to succeed or were too dangerous to be tried. We begin with a general discussion of Utah's Interception of Communications Act (the Act), which to date has received limited attention from Utah appellate courts. *See generally* Utah Code Ann. §§ 77-23a-1 to -16 (LexisNexis 2017 & Supp. 2022). We then address Sadat's challenge to the district court's determination that Officer had demonstrated necessity under the Act.

I

¶16    The Act generally prohibits the nonconsensual interception and disclosure of wire, electronic, or oral communications. *See generally id.* § 77-23a-2(4) (2017).[9] The Act, however, allows law enforcement in certain criminal investigations to seek court authorization to intercept and use such communications. *See id.* §§ 77-23a-2(3)–(4), -8, -10. In its findings that precede the substantive text of the Act, the Utah Legislature explains that because "[o]rganized criminals make extensive use of wire and oral communications in their criminal activities," "[t]he interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice." *Id.* § 77-23a-2(3). Yet, "[t]o safeguard the privacy of innocent persons," the legislature has approved the nonconsensual interception of wire or oral communications "only when authorized by a court of competent jurisdiction" pursuant to the requirements of the Act. *See id.* § 77-23a-2(4). If a defendant contends that a communication was "unlawfully intercepted," the

---

9. Because there have been no substantive changes to the relevant statutory provisions, we cite the current version of the Utah Code for the reader's convenience.

defendant may move to suppress the contents of the communication on that basis.[10] *Id.* § 77-23a-10(11)(a)(i).

¶17 One of the Act's requirements is referred to by the parties as the necessity requirement. It requires that an application for a wiretap order "include . . . a full and complete statement as to whether other investigative procedures have been tried and failed or why they reasonably appear to be either unlikely to succeed if tried or too dangerous." *Id.* § 77-23a-10(1)(c). And the judge who issues a wiretap order must find, based on the facts submitted by the applicant, that "normal investigative procedures have been tried and have failed or reasonably appear to be either unlikely to succeed if tried or too dangerous."[11] *Id.* § 77-23a-10(2)(c). Because the necessity requirement is framed in the disjunctive, law enforcement may establish necessity by showing any one of the

---

10. The Act allows any "aggrieved person in any trial, hearing, or proceeding in or before any court" to move to suppress an unlawfully intercepted communication. *See* Utah Code Ann. § 77-23a-10(11)(a) (LexisNexis 2017). An "aggrieved person" is defined in the Act as "a person who was a party to any intercepted wire, electronic, or oral communication, or a person against whom the interception was directed." *Id.* § 77-23a-3(1). The State does not contest Sadat's standing to challenge the wiretap on Tamer's mobile phone. Thus, we assume that Sadat is an "aggrieved person" under the Act for the purpose of both wiretaps.

11. In addition to the necessity requirement being satisfied, a court must also determine that there is probable cause to believe that (1) "an individual is committing, has committed, or is about to commit a particular offense," (2) "communications concerning that offense will be obtained through the interception," and (3) the place where the communications are to be intercepted is leased by, listed in the name of, or commonly used by the targeted individual. *Id.* § 77-23a-10(2)(a), (b), (d). Sadat does not contend that these other requirements were unmet.

three. *See State v. Martinez*, 896 P.2d 38, 40 (Utah Ct. App. 1995) (holding that the "disjunctive 'or' . . . delineates alternative ways" to meet a statutory requirement).

¶18 Finally, as noted above, the issue of whether a wiretap application satisfies the necessity requirement of section 77-23a-10(1)(c) of the Act appears to be one of first impression in Utah appellate courts. However, Utah's necessity requirement is "substantially identical" to the necessity requirement in the federal wiretap statute, *see United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995) (comparing Utah Code Ann. § 77-23a-10(1)(c) with 18 U.S.C. § 2518(1)(c)),[12] and the federal necessity requirement has been extensively analyzed by the federal courts. Accordingly, the parties have relied on federal law in support of their arguments, and we will refer to federal law to the extent it aids in our review of the district court's application of the Act. *See State v. Bradshaw*, 2006 UT 87, ¶ 11, 152 P.3d 288 (observing that federal law may be "instructive and aid us in our efforts to interpret the Utah statute" where the Utah statute is modeled after the federal statute).

## II

¶19 Sadat contends that the district court erred in determining that Officer's applications for authorization to wiretap Tamer's

---

12. An application to intercept wire, oral, or electronic communications under the federal wiretap statute requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Before issuing the wiretap order, a judge must find, based on the facts submitted, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c).

and Sadat's mobile phones satisfied the Act's necessity requirement. In particular, Sadat contends that Officer's affidavits demonstrated other investigative techniques had proven successful in the past, and that the district court erred in finding Officer had adequately explained why those same techniques were inadequate (or too dangerous) to achieve Officer's stated investigatory goals. We disagree with Sadat.

¶20 To satisfy the Act's necessity requirement, Officer was required to include with his wiretap applications "a full and complete statement as to whether other investigative procedures have been tried and failed *or* why they reasonably appear to be either unlikely to succeed if tried or too dangerous." Utah Code Ann. § 77-23a-10(1)(c) (LexisNexis 2017) (emphasis added). The district court correctly determined that Officer's applications met this statutory standard. Officer chronicled other investigative procedures that had been used in the past as part of law enforcement's ongoing efforts to investigate TCS's criminal activity and explained why those same procedures reasonably appeared to be unlikely to succeed in achieving Officer's investigatory goals.

¶21 To put his claims of necessity in context, Officer first identified the three goals of his investigation: (1) to document and confirm the identities of TCS members, including those in management positions; (2) to dissolve or at least severely disrupt TCS's criminal operations; and (3) to obtain "gang-specific intelligence" to aid in preventing or suppressing future criminal behavior. The affidavit for the wiretap of Sadat's phone included the additional goal of discovering details about Sadat's "specific role" in the gang. Officer explained that "shot callers" like Tamer and Sadat evade prosecution by hiding behind subordinate gang members whom they direct to commit crimes on behalf of the criminal enterprise. Thus, the affidavits made clear that Officer hoped to dismantle TCS by developing prosecutable evidence against its shot callers.

¶22   As the district court determined, these are investigatory goals that federal courts have often found warranted the use of wiretaps because the goals were "not likely to be met by traditional law enforcement techniques." Indeed, "normal investigative techniques . . . are sometimes insufficient to determine the scope of the conspiracy or the nature of the conspiracy leader's on-going criminal activity." *United States v. Bailey*, 840 F.3d 99, 116 (3d Cir. 2016) (cleaned up); *see also United States v. Foy*, 641 F.3d 455, 464–65 (10th Cir. 2011) ("[W]e have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps."); *United States v. Villarman-Oviedo*, 325 F.3d 1, 10 (1st Cir. 2003) (approving wiretap authorization when investigative goals involved "uncovering the full scope of the potential crimes under investigation, as well as the identities of those responsible for the unlawful manufacture, possession, sale and distribution of narcotics in Puerto Rico" and "obtaining evidence of the totality of offenses in which the targets of the investigation were involved"); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) (affirming the district court's necessity determination and stating that "[t]he FBI was properly concerned . . . with identifying all of the members of the conspiracy, as well as the precise nature and scope of the illegal activity"). Further, the legislature recognized the value of wiretaps in disrupting organized crime when it deemed wiretaps to be an "indispensable aid to law enforcement and the administration of justice" given the extensive use of wire and oral communications made by "[o]rganized criminals." *See* Utah Code Ann. § 77-23a-2(3) (LexisNexis 2017).

¶23   Next, Officer detailed the traditional techniques that law enforcement had used for nearly two decades to investigate TCS's criminal activities, which included shootings, assaults, other violent crimes, and drug distribution. For example, Officer described how law enforcement had previously used knock and talks, confidential informants, trash covers, controlled buys, and

searches in its efforts to uncover evidence of TCS's criminal activities. In chronicling this lengthy history, Officer described instances where law enforcement was able to gather intelligence, seize evidence, and, in some cases, make arrests that led to the prosecution of some TCS members. But in most instances, law enforcement's success was limited to the seizure of small amounts of drugs and paraphernalia with scant information discovered about the gang. Through its efforts, law enforcement did not "[d]issolve" or "severely disrupt" TCS's criminal operations because it was unable to hold shot callers like Sadat accountable for the serious crimes committed at their direction.

¶24 Further, Officer explained in his second affidavit that before obtaining the wiretap on Sadat's phone, law enforcement again tried other investigative techniques like installing "an electronic monitoring device onto a vehicle registered and used by Sadat," "conducting physical surveillance at Sadat's residence," and completing a trash cover operation where officers "collected trash from a garbage can placed on the street in front of [Sadat's] residence." Officer reported that these efforts "yielded nothing of value" in his effort to prosecute Sadat for his part in directing TCS's criminal activities because, as a shot caller, Sadat "avoids direct participation" in those activities.

¶25 Finally, Officer tied the stated goals and the investigative history together by explaining why the traditional investigative techniques, if employed again, appeared unlikely to produce different results or evidence that would allow law enforcement to achieve its goal of dissolving or severely disrupting TCS's criminal operations through prosecution of its shot callers. Specifically, Officer detailed why "other investigative procedures" used by law enforcement "reasonably appear[ed] to be either unlikely to succeed if tried or too dangerous" in achieving that goal. *See id.* § 77-23a-10(1)(c).

¶26    *Surveillance*. Officer explained that physical surveillance reasonably appeared unlikely to succeed in achieving the investigatory goals because (1) the shot callers "distance[d]" themselves from the criminal activity, meaning that surveillance would not allow law enforcement to witness them committing crimes and (2) surveillance would not capture the communications between the shot callers and their subordinates so as to establish their "culpability for the crimes committed by others." Thus, surveillance created "little chance" of disrupting the gang's criminal operations through prosecution of its leadership.

¶27    *Knock and talks*. Officer described how law enforcement had attempted to interview Tamer and Sadat and "many of [their] gang associates" with little success because of a general unwillingness "to entertain any form of consensual interaction with police." And although Officer agreed that knock and talks could result in the discovery of evidence of some criminal activity, he opined based on prior experiences that those efforts reasonably appeared to be unlikely to produce the kind of information that would establish Sadat's position in the gang and evidence of the direction he gave to junior gang members. After all, TCS members were encouraged by those in positions of authority either to refuse to speak to police or to deny involvement in criminal activity.

¶28    *Undercover operations and confidential informants*. Officer explained that engaging in undercover operations or employing confidential informants to try to disrupt the TCS organization was impractical and unlikely to succeed. Among other things, Officer described the relatively small size of the TCS gang and explained that because of that size, it was "simply not practical" to introduce an undercover operative. Officer also explained that TCS's preference for juvenile inductees, who are recruited by invitation only, would make it particularly difficult to engage in an undercover operation. Officer also discounted the use of confidential informants given the tight-knit nature of the gang

and the lack of a "suitable candidate." Further, "information pertaining to the gang's day-to-day operations"—that is, the information law enforcement needed to disrupt the organization—was "well protected."

¶29 *Trash covers*. Officer described how trash covers had been used in the past but explained that the evidence gathered was "inadequate in terms of preventing the perpetual criminal actions taken by members of . . . TCS." Officer also revealed that Tamer was "aware of the technique," making it even less likely to lead to incriminating evidence.

¶30 *Controlled buys*. Officer explained that law enforcement had, with some success, used controlled buys with members of TCS to obtain evidence of drug offenses. But despite that "limited and localized success" at bringing drug charges, controlled buys did not reasonably appear likely to aid in the investigatory goals—specifically, the dismantling of TCS through the prosecution of the shot callers. Further, there was no intelligence that TCS was currently distributing drugs since TCS's primary distributor was incarcerated.

¶31 *Searches*. Officer explained that prior searches, while occasionally resulting in drug charges, had proven ineffective in dissolving the organization. Despite occasional prosecutions for drug-related offenses, the operation continued, and searches were unlikely to produce evidence of TCS's "structure and/or criminal directive model of operation."

¶32 *Pen registers*. Finally, Officer explained that the use of pen registers would be "unlikely to provide any additional information" because Officer already had similar data from jail phone records, from the extraction of digital data from mobile phones of subordinate members, and from "call detail records" of Tamer's mobile phone number. And Officer explained that pen registers were not "a means by which essential information would

be obtained." *See* Utah Code Ann. § 77-23a-3(14) (LexisNexis 2017).

¶33   In sum, Officer's fact-specific and detailed explanations show that law enforcement's investigative goal to "discover[] and prosecute the entire leadership and membership of [TCS] and discover the conspiracy between its members [was] a legitimate investigative goal that was not likely to be met by traditional law enforcement techniques." Although traditional investigative techniques may have been sufficient to bring charges against some TCS members for some criminal activity, Officer demonstrated necessity for the wiretaps of Tamer's and Sadat's mobile phones given that those traditional techniques were not reasonably likely to aid in the investigative goal of disrupting TCS through the prosecution of its shot callers. *See, e.g.*, *United States v. Encarnacion*, 26 F.4th 490, 501 (1st Cir. 2022) (concluding that the government had met the federal wiretap necessity requirement where it had "plausibly explained why traditional means of investigation, including those it had already attempted, were insufficient to achieve the stated goals of the investigation"); *United States v. Braddy*, 722 F. App'x 231, 235 (3d Cir. 2017) (holding that "wiretaps were necessary to uncover the full scope of the conspiracy" despite the fact that "traditional investigative techniques may be sufficient to implicate some members of a conspiracy"). Thus, we conclude that the district court correctly determined that Officer had complied with the necessity requirement of section 77-23a-10(1)(c) of the Act and did not err in denying the motion to suppress.

## CONCLUSION

¶34   In seeking authorization for wiretaps of the mobile phones of Tamer and Sadat Hebeishy, Officer demonstrated that "normal investigative procedures have been tried and have failed or reasonably appear to be either unlikely to succeed if tried or too

dangerous." *See* Utah Code Ann. § 77-23a-10(2)(c) (LexisNexis 2017). Specifically, Officer showed that normal investigative procedures would have been insufficient to achieve the investigatory goal of severely disrupting TCS's organization by prosecuting its shot callers. Thus, the district court did not err in denying the motion to suppress based on its conclusion that Officer satisfied the necessity requirement of section 77-23a-10(1)(c) of the Act. We affirm.

_____