# United States Court of Appeals
## For the First Circuit

Nos. 05-1144, 05-1145

UNITED STATES OF AMERICA,
Appellee,

v.

ALFRE LUIS BRAVO and
JESÚS ANTONIO MARTÍNEZ-ROSADO,
Defendants, Appellants.

No. 05-1146

UNITED STATES OF AMERICA,
Appellee,

v.

LUIS ANTONIO MANCILLA-PATINO,
Defendant, Appellant.

No. 05-1147

UNITED STATES OF AMERICA,
Appellee,

v.

JOSNE SAID ISAA-MORALES,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, <u>Circuit Judge</u>,
Baldock,[*] <u>Senior Circuit Judge</u>,
and Stahl, <u>Senior Circuit Judge</u>.

─────────────

<u>Luis R. Lugo-Emanuelli</u>, with whom <u>Jorge Maldonado-Ríos</u> was on brief, for appellants Alfre Luis Bravo and Jesús Antonio Martínez-Rosado.
<u>Marlene Aponte-Cabrera</u>, for appellant Luis Antonio Mancilla-Patino.
<u>Lydia Lizarríbar-Masini</u>, for appellant Josne Said Isaa-Morales.
<u>Nelson Pérez-Sosa</u>, Assistant United States Attorney, Chief, Appellate Division, with whom <u>Rosa Emilia Rodríguez-Vélez</u>, United States Attorney, was on brief, for appellee.

─────────────

May 29, 2007

─────────────

─────────────

[*] Of the Tenth Circuit, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>.  On September 7, 2004, a jury found co-defendants-appellants Alfre Luis Bravo ("Bravo"), Jesús Antonio Martínez-Rosado ("Martínez"), Luis Antonio Mancilla-Patino ("Mancilla") and José Said Isaa-Morales ("Isaa") (collectively "Appellants") guilty of two offenses: (1) possession with intent to distribute more than one thousand kilograms of marijuana on board a vessel and aiding and abetting, in violation of 46 U.S.C. app. § 1903(a) (repealed 2006), and 18 U.S.C. § 2, and (2) conspiracy to possess with intent to distribute more than one thousand kilograms of marijuana on board a vessel, in violation of 46 U.S.C. app. § 1903(j).  Thereafter, the Appellants were sentenced to a term of imprisonment of 120 months followed by five years supervised release as to each count, to be served concurrently.[1]  The Appellants now appeal their convictions and sentences.

## I. Background

On April 18, 2004, at approximately 4:45 A.M., the United States Coast Guard ("USCG") cutter DEPENDABLE found the M/V EL CONQUISTADOR (the "vessel") riding low and "dead in the water" in international waters 180 nautical miles south of Santo Domingo, Dominican Republic.  A Rigid Hulled Inflatable Boat, the ABLE 2, was launched from the DEPENDABLE to approach the vessel.

The ABLE 2 observed that the vessel's name was written on its stern, but the vessel did not have a visible registration

---

[1]  A special monetary assessment of $200 was also imposed.

-3-

number, port identification, or country flag. On board the ABLE 2, Officer Brian Hennessey ("Hennessey"), a technician and federal law enforcement officer with the USCG, requested that the vessel indicate its nationality. The vessel master answered that the vessel was registered in Colombia. He further claimed that the vessel had been fishing for approximately seven to eight days, but that the vessel's engines were broken, and that they had no fish on board and were en route to Haiti.[2] Hennessey testified that he perceived a strong smell of marijuana coming from the vessel. Hennessey relayed via radio the information from the vessel master to the DEPENDABLE and waited for permission to board the vessel.

At 7:39 A.M., Sean Connett ("Connett"), an employee with the USCG at the District Command Center in Miami, contacted the Colombian authorities to confirm the registry of the vessel via a written form entitled "Action Request." The Colombian authorities shortly responded with a "Response to the Action" form, indicating that they could neither confirm nor refute that the EL CONQUISTADOR was a Colombian vessel. The Colombian authorities also suggested that the USCG proceed under "international law" and requested that the USCG inform them of the results of the inspection.

Acting on the premise that the vessel was "stateless" or "without nationality," the USCG sought to place the vessel within

---

[2] The record indicates that the vessel did not contain any fish, usable fishing nets, line gear or refrigeration.

-4-

U.S. jurisdiction. The Maritime Drug Law Enforcement Act ("MDLEA") allows the United States to conduct drug law enforcement outside of the United States, and more specifically, exercise jurisdiction over stateless vessels. 46 U.S.C. app. § 1903(c). In accordance with the MDLEA, Connett requested and received a "Statement of No Objection" from the USCG headquarters in Washington, D.C., granting permission to board EL CONQUISTADOR. Connett forwarded the Statement to the USCG office in San Juan, which then forwarded it to the DEPENDABLE.

Upon boarding the vessel, Hennessey observed what appeared to be bales of marijuana, two of which were outside the fish hold, forty-six of which were inside the fish hold.[3] He then conducted a field test confirming that the bales were, in fact, marijuana. In order to access the bales, USCG officers broke the fish hold, and transferred the bales onto the DEPENDABLE.[4] The vessel's five crew members -- the four Appellants and the captain, Joaquín Emilio Cardona-Sandoval ("Cardona-Sandoval") -- were also brought on board the DEPENDABLE. The Colombian authorities were notified of the USCG's findings, and upon arrival in San Juan, the

---

[3] The Drug Enforcement Administration ("DEA") later determined that the bales constituted approximately 5,000 pounds of marijuana with a street value of $7.5 million.

[4] USCG Officers then destroyed the vessel, as it had been taking on water and towing would have been difficult and time consuming.

Appellants were transferred to U.S. Immigration and Customs Enforcement ("ICE") and detained.

At their joint trial, Appellants testified that they were fisherman in their home country of Colombia and that in 2004 they were recruited in Colombia to participate in a fishing expedition by two individuals known to them as "Paco" and "Roberto." Appellants testified that they were unacquainted with each other when they arrived at the vessel. They further testified that when they arrived, Paco and Roberto, along with others, were armed with weapons, and marijuana was on the vessel. According to Appellants, Paco threatened that Appellants' families would be killed if they did not take the marijuana to Haiti. Appellants testified that they feared for their families. After a few days at sea, the vessel broke down.

On September 7, 2004, a jury found all four Appellants guilty of both counts of the indictment. A pre-sentencing report ("PSR") was then filed on November 18, 2004, recommending that Appellants be granted a two-point reduction in their base offense level of 32 due to their minor roles in the offense. Martínez and Bravo were sentenced individually, and Isaa and Mancilla were sentenced jointly. At Appellants' various sentencing hearings, the government opposed the minor role reduction. The court denied the minor role adjustments, indicating that the evidence was such that

it could not state who was a major and who was a minor participant in the case.

At his sentencing hearing, Appellant Martínez raised no objections to the PSR, and accordingly, was not granted any adjustments, and was sentenced to 120 months imprisonment. In the other sentencing hearings, Appellants Bravo, Isaa and Mancilla objected to the PSR and requested a safety-valve benefit, as well as a downward departure for duress. Appellants participated in a government debriefing in order to qualify for the safety-valve benefit, but they each received a sealed motion from the government stating that the safety-valve would not be recommended because the government did not believe that Appellants had provided all available information in a truthful manner.[5]

Isaa's and Mancilla's joint hearing was held on December 8, 2004. The court granted them an immediate hearing to determine their entitlement to the safety-valve benefit. A DEA special agent testified that, although Appellants' stories coincided in certain aspects, it was abnormal that Appellants did not know the details of how the drug transfer was going to take place. He explained that the scenario was "too risky" to be believable; he had never investigated a case in which a drug

---

[5] See 18 U.S.C. § 3553(f)(5) (requiring that "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense"); U.S.S.G. § 5C1.2(a)(5) (same).

-7-

trafficker had placed unknown individuals against their wills on a vessel loaded with contraband of such value without providing information about the transfer, or without agreeing to any payment. The agent also noticed that, based on his experience and training, Appellants appeared to easily answer "non-stressful" questions about their families and Colombia, but that a level of stress or deception was perceptible in Appellants' answers to questions regarding the smuggling venture, the drugs, and payments.

The court denied Isaa and Mancilla the safety-valve benefit, indicating that the consistency of Appellants' statements did not overcome the gaps in the logic of their story. The court also denied their requests for a downward departure for duress. Again, the court indicated that it did not find Appellants' stories to be totally truthful. Both Appellants were then sentenced to the statutory mandatory minimum term of 120 months of imprisonment.

Bravo was sentenced a week later, on December 15, 2004. The district court denied Bravo's request for a safety-valve hearing, and subsequently denied him the safety-valve benefit. Neither denial was explained by the court. The court also denied Bravo's request for a downward departure for duress, and sentenced him to the statutory mandatory minimum term of 120 months of imprisonment.

Appellants now appeal a variety of issues regarding their convictions and sentences.

## II. Issues on Appeal

### A. The United States' Jurisdiction over the Vessel

Appellants are neither citizens nor resident aliens of the United States and the vessel involved was not a vessel of the United States. Thus, for Appellants to be prosecuted under the MDLEA, the vessel must be "subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(a). Whether the district court erred in determining that it had jurisdiction over the vessel, and therefore over Appellants, is a question of law subject to de novo review. See id. § 1903(f) ("All jurisdictional issues arising under this chapter are preliminary questions of law . . . ."); see also United States v. Gonzáles, 311 F.3d 440, 443 (1st Cir. 2002)("The term 'jurisdiction' . . . evidently refers to the substantive reach of the *statute*--applying to some vessels but not others--and not to subject matter jurisdiction of the court.").

Under the MDLEA, "a 'vessel subject to the jurisdiction of the United States' includes . . . a vessel without nationality." 46 U.S.C. app. § 1903(c)(1)(A). Additionally, "a 'vessel without nationality' includes . . . a vessel aboard which the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." Id. § 1903(c)(2)(C). Here, the vessel master claimed registry in Colombia, and after contacting the appropriate Colombian authorities, the USCG received a

-9-

"Response to the Action" form from Colombia neither confirming nor refuting the vessel's registration in Colombia. Since Colombia, as the nation of alleged registry, could not confirm the vessel's registration, the vessel qualifies as a "vessel without nationality" under the MDLEA, and is within the jurisdiction of the federal courts of the United States.

Under the plain language of the MDLEA, Appellants' argument that jurisdiction includes a nexus requirement -- i.e., a requirement that the government show that the marijuana transported in the vessel would affect the United States, fails. The Appellants' reliance on United States v. Hayes, 653 F.2d 8 (1st Cir. 1981) (finding a jurisdictional nexus requirement for the application of the Comprehensive Drug Abuse and Control Act of 1970, § 1013, 21 U.S.C. § 963, to a vessel apprehended in international waters) and United States v. Cafiero, 242 F. Supp. 2d 49 (D. Mass. 2003) (finding a jurisdictional nexus requirement for the application of the Comprehensive Drug Abuse and Control Act of 1970, §§ 401, 404, 21 U.S.C. §§ 841, 844, to an Italian citizen aboard a flight that made an unplanned diversion into United States territory), is misplaced. Those cases find a jurisdictional nexus requirement in the Comprehensive Drug Abuse and Control Act of 1970. We do not read the MDLEA to require a jurisdictional nexus. See, e.g., United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999) ("[D]ue process does not require the government to prove a

nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA . . . ."); United States v. Rendon, 354 F.3d 1320, 1325 (11th Cir. 2003)("[T]his circuit . . . ha[s] not embellished the MDLEA with a nexus requirement."); United States v. Moreno-Morillo, 334 F.3d 819 (9th Cir. 2003) (holding that Congress did not act under its Commerce Clause authority in enacting the MDLEA and, thus, "no nexus between the activities proscribed by the MDLEA and interstate or foreign commerce" is required); United States v. Suerte, 291 F.3d 366, 375 (5th Cir. 2002) ("[T]o the extent the Due Process Clause may constrain the MDLEA's extraterritorial reach, that clause does not impose a nexus requirement."); United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993) (finding no nexus requirement in the MDLEA to search stateless vessel in international waters).

Equally misplaced is Appellants' contention that the United States disregarded the recommendation of the Colombian authorities to follow "international law" when apprehending the vessel. The USCG acted within both international treaty law and customary international law. The Agreement to Suppress Illicit Traffic by Sea, ratified and brought into force by the United States and Colombia in 1997, is the treaty governing the apprehension of the vessel and its crew. See Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea,

Feb. 20, 1997, T.I.A.S. No. 12835. The treaty authorizes the country requesting verification of a registry to "proceed in accordance with international law" in the event that neither party can confirm or refute a flag claim of a vessel in international waters, id. art. 8, and the MDLEA is in compliance with international law. The extra-territorial jurisdiction authorized in the MDLEA is consistent with the "protective principle" of international law, see Cardales, 168 F.3d at 553 (explaining that the protective principle permits a nation "'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security'") (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988)), and is supported by numerous international treaties and agreements, including the Single Convention on Narcotic Drugs, Mar. 30 1961, 18 U.S.T. 1407, and its 1972 Protocol, Amendment of the Single Convention on Narcotic Drugs, Mar. 25, 1972, 26 U.S.T. 1439; the Convention on Narcotic Drugs: Psychotropic Substances, Feb. 21, 1971, 32 U.S.T. 543; the United Nations Convention on the Law of the Sea, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 3; and the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, 28 I.L.M. 493.[6]

---

[6] We render no opinion as to whether or to what extent these agreements or any analogous agreements are binding on the United States.

-12-

Our conclusion is without doubt or reservation: the United States had jurisdiction over the vessel, and was correct to apply the MDLEA to Appellants.

## B.  Lack of Pre-trial Determination of Jurisdiction

The Appellants assert that the district court erroneously allowed the jury to hear testimony regarding jurisdiction. We agree.  "All jurisdictional issues arising under [the MDLEA] are preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. app. § 1903(f).  The exposure of the jury to the jurisdictional testimony nonetheless was harmless. Non-constitutional evidentiary error is harmless "so long as it is highly probable that the error did not influence the verdict." United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005) (internal quotation marks omitted).  Here, that standard is met because the jury was presented with ample evidence that the Appellants possessed marijuana, and that they did so with the intent to distribute it.  Moreover, the jury was instructed on the issues that it had to determine, and instructed that jurisdiction over the vessel was not an issue in the case, making it even more unlikely that the error affected the jury's verdict. See id. (finding that a non-constitutional evidentiary error was harmless because the jury was presented with ample evidence of the defendant's guilt, and the judge correctly instructed the jury).

## C. Motion to Suppress

Appellants challenge the denial of their pre-trial motion to suppress the bales of marijuana seized from the vessel on the grounds that the USCG lacked reasonable suspicion to stop and search the vessel, in violation of the Fourth Amendment. We apply a mixed standard of review to the district court's denial of the suppression motion, reviewing the court's findings of fact for clear error and the application of the law to those facts de novo. Tinoco, 304 F.3d at 1116.

The Fourth Amendment prohibits "unreasonable searches and seizures" whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is "fully accomplished" at the time of an unreasonable government intrusion. United States v. Calandra, 414 U.S. 338, 354 (1974); see also United States v. Leon, 468 U.S. 897, 906 (1984). For purposes of this case, therefore, if there was a constitutional violation of the Fourth Amendment, it occurred solely in international waters, where the search and seizure took place. But the Fourth Amendment does not apply to activities of the United States against aliens in international waters. See United States v. Verdugo-Urquidez, 494 U.S. 259, 267 (1990). The Supreme Court's holding in Verdugo-Urquidez is clear that the actions of the United States directed against aliens in foreign territory or in international waters are not constrained by the Fourth Amendment. 494 U.S. at 267 ("There is

-14-

. . . no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."); see also United States v. Vilches-Navarrete, 413 F. Supp. 2d 60, 69 (D. P.R. 2006) ("In light of the Supreme Court's holding in Verdugo-Urquidez, it is pellucid that the Fourth Amendment does not apply to the search of non-resident aliens on a ship in international waters.").  Accordingly, the district court was correct in denying Appellants' motion to suppress because the Fourth Amendment was inapplicable to the USCG's search of the vessel.

**D.  Sufficiency of the Evidence to Convict**

Appellants moved for judgment of acquittal, pursuant to Fed. R. Crim. P. 29, after the conclusion of the Government's case in chief and again after the close of all the evidence.  The district court denied both motions.  Here, Appellants claim that the evidence is insufficient to establish beyond a reasonable doubt that they had the required intent to violate the laws of the United States. Specifically, Appellants allege that the evidence is insufficient to establish that they intended to distribute the marijuana, as required by 46 U.S.C. app. § 1903(a), see United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997), or that they sought by their actions to make the trafficking venture succeed, as required by 18 U.S.C. § 2, see id. at 341-42.  "We review Rule 29

-15-

determinations de novo, resolving any evidentiary conflicts or credibility issues in the government's favor." Id. at 339. "If the evidence, viewed under this lens, permits a rational jury to find . . . the crime charged beyond a reasonable doubt, then the evidence is legally sufficient." Id. (internal quotation marks omitted).

In circumstantial cases such as this one, the evidence is sufficient to convict if it adequately supports the "the requisite two-step inference": (1) that the vessel was engaged in obviously illegal activity, and (2) that each Appellant was ready to assist in the criminal enterprise. United States v. Jiménez-Pérez, 869 F.2d 9, 11 (1st Cir. 1989) (internal quotation marks omitted). The government argues that the jury could have reasonably drawn this two-step inference from the evidence (i) that the Appellants admitted to knowing that marijuana was on the vessel before or shortly after the vessel departed, (ii) that the Appellants did not seek to return to Colombia nor destroy the marijuana, and (iii) that although the Appellants claimed that they thought they were going on a fishing expedition, the vessel lacked fish, usable fishing nets, line gear or refrigeration. See United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991) (holding that the evidence "may be entirely circumstantial"). Appellants respond that their presence on the vessel or even their knowledge that they were transporting marijuana is insufficient to establish their

-16-

intent, see Guerrero, 114 F.3d at 342 ("Mere presence at the scene or even knowledge that the crime is being committed is generally insufficient . . . .") (internal quotation marks omitted), particularly since they claim to have only participated under duress.

Resolving all credibility issues in favor of the government, we find the record sufficiently complete to support a finding beyond a reasonable doubt that Appellants committed the crime charged. The circumstantial evidence supports the inference of drug trafficking, and there is no evidence opposing the jury's determination that Appellants' testimony in support of their duress defense was incredible. United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995) (affirming where a jury's "inferences derive support from a plausible rendition of the record" and their "conclusions flow rationally from those inferences"); see also United States v. Cuevas-Esquivel, 905 F.2d 510, 514-15 (1st Cir.), cert. denied, 498 U.S. 877 (1990)(quoting United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982), cert. denied, 459 U.S. 1110 (1983))(concluding that it is the province of the jury, not the court, to determine credibility of the witnesses, and noting that "'[n]either juries nor judges are required to divorce themselves of common sense,' where, as here, the appellant[s'] portrayal of himself as an innocent bystander[s] is 'inherently unbelievable.'").

**E.  Pre-trial Ruling on the Defense of Duress**

Prior to trial, Appellants sought to present a defense of duress.  The district court stated that it would not rule on a duress instruction to the jury until after Appellants had testified, if they were willing to do so, and only if the court determined that Appellants met the standard for the submission of the charge to the jury.

The burden of proof to demonstrate duress is on Appellants.  United States v. Amparo, 961 F.2d 288, 291 (1st Cir. 1992).  In order to establish a claim of duress, the defendant must show that: (1) he acted under an immediate threat of serious bodily injury; (2) he had a well-grounded belief that the threat would be carried out; and (3) he had no reasonable opportunity to escape or otherwise frustrate the threat.  United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996).  A trial court may refuse a duress instruction if insufficient evidence is presented.  Id.

After Appellants presented their case for duress, the court found that the Appellants met the requisite burden of proof and instructed the jury as to a defense of duress.  The jury, however, did not find that Appellants were acting under duress.  Appellants Bravo and Martínez now claim that, because the court did not rule on the applicability of a duress offense until after the close of all evidence, they were denied the opportunity to choose a defense strategy in advance and participate in a fair trial.

The district court clearly has the discretion to either employ a pre-trial hearing or to wait until after all evidence has been heard at trial, to determine whether the evidence of duress is sufficient as a matter of law to warrant an instruction. See, e.g., United States v. Bailey, 444 U.S. 394, 399-401 (1980) (upholding the convictions of four defendants, three of whom, at their joint trial, were denied a duress instruction after the close of evidence, and the fourth defendant who, at a separate trial, was denied a duress instruction prior to trial). Indeed, we are unaware of any case mandating a pre-trial determination of the sufficiency of the evidence for a duress defense. Moreover, the record indicates that Appellants were not prevented from arguing at trial that Appellants were acting under duress, or from presenting evidence to the jury, including the testimony of each Appellant, allegedly demonstrating that they acted under duress. Thus, the district court did not err by denying Appellants a pre-trial determination on their duress defense.

## F. Sentencing

### 1. Adjustment for Minor Participation

Appellants claim that the district court erred in failing to grant them a two-level downward adjustment in their base offense level due to their alleged minor participation in the offense, as compared to Cardona-Sandoval, the captain of the vessel. We will only reverse the district court's finding that Appellants were not

minor participants if that finding is clearly erroneous. <u>United States</u> v. <u>Villarman-Oviedo</u>, 325 F.3d 1, 16-17 (1st Cir. 2003). Appellants bear the burden of proving that they are entitled to downward adjustments for their roles in the offense. <u>United States</u> v. <u>Tom</u>, 330 F.3d 83, 95 (1st Cir. 2003). If the record supports at least two permissible inferences, the factfinder's choice between or among them cannot be clearly erroneous. <u>Villarman-Oviedo</u>, 325 F.3d at 16. Accordingly, we rarely reverse a district court's decision regarding whether to apply a minor role adjustment. <u>Tom</u>, 330 F.3d at 95.

A downward adjustment for a defendant's minor role in an offense is permitted for a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b), cmt., n.5. Here, although the PSR recommended that a two-level adjustment be granted, the government objected to the recommendation, arguing that Appellants were culpable to the same degree because they were all members of the vessel's crew, equally advancing the same venture. Appellants argued that because none of them were the captain of the vessel, but rather crew members, with less significant functions than the captain, they held minor roles. In denying the adjustment, the sentencing court ruled that it could not differentiate the major from the minor participants in the case.

While we acknowledge that the record indicates that Cardona-Sandoval was the captain of the vessel, and that Appellants were the crew, it is not clear that the sentencing judge erred in denying the adjustment. Appellants failed to demonstrate that any of them were less culpable than the others, United States v. Brandon, 17 F.3d 409, 460 (1st Cir. 1994) (affirming denial of minor participant adjustment where defendant was less culpable than the major participants, but not less culpable than most of the other defendants), or that their participation was less than the average participation in the venture, United States v. Osorio, 929 F.2d 753, 764 (1st Cir. 1991). Accordingly, we cannot find that the district court's denial of the adjustment was in error.

### 2. The Safety Valve Benefit

Bravo, Isaa and Mancilla each appeal the district court's denial of their safety-valve petitions. A defendant bears the burden of demonstrating his entitlement for the safety-valve reduction. United States v. Rodríguez-Ortiz, 455 F.3d 18, 25 (1st Cir. 2006). To qualify for this benefit, the defendant must demonstrate, among other things,[7] that he truthfully provided the

---

[7] To qualify for the safety valve, defendants must satisfy the following five criteria, the first four of which are not in dispute in the instant appeal: (1) not have more than one criminal history point; (2) not have used violence or possessed a firearm during commission of the offense; (3) not have killed or seriously injured another person; (4) not have been a leader or manager in the offense or was involved in a continuing criminal enterprise; and (5) have truthfully provided the government with all information and evidence he possesses concerning the offense. 18 U.S.C. § 3553

government with all the information and evidence he possesses concerning the offense. 18 U.S.C. § 3553 (f)(5).[8] Indeed, "nothing short of truthful and complete disclosure shall suffice." United States v. Bermúdez, 407 F.3d 536, 542 (1st Cir. 2005) (quoting United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003)); United States v. Richardson, 225 F.3d 46, 53 (1st Cir. 2000) (not clearly erroneous to deny safety valve benefit where the defendant failed to divulge information he possessed concerning the crime at the proffer session).

The district court's finding on eligibility must be "an independent determination," United States v. White, 119 F.3d 70, 73 (1st Cir. 1997), resting on more than "bare conclusions," United States v. Miranda-Santiago, 96 F.3d 517, 528 (1st Cir. 1996). Although it is preferable that the court support its decision with "specific factual findings," a district court may rest its decision on conclusory statements if those conclusions have "easily recognizable support in the record." See id. at 529.

Unfortunately, the district court failed to make even conclusory statements as to why Bravo did not merit safety-valve relief. The record shows that Bravo's repeated attempts to discuss his safety-valve eligibility were rebuffed by summary denials of

---

(f).

[8] It is not disputed that the three Appellants seeking the safety valve in the instant appeal meet the first four criteria.

-22-

his eligibility by the district court. The district court's failure to provide any explanation of its reasoning for denial falls well below the standard set in Miranda-Santiago, 96 F.3d at 528-29. Accordingly, we remand Bravo's safety-valve determination for reconsideration by the court.

In the case of Isaa and Mancilla, the district court's safety-valve determinations were based on analysis of the facts of the case. We therefore review those determinations for clear error. United States v. Márquez, 280 F.3d 19, 22 (1st Cir. 2002) ("To the extent that [a safety valve] ruling depends on differential factfinding, we review it for clear error."). If we find that the record, taken as a whole, will not support a finding that the defendants failed to provide a truthful and complete proffer, the government must demonstrate more than a simple lack of confidence that the proffer is complete to justify the denial of the safety valve. Id. at 24.

At Isaa's and Mancilla's joint hearing, the district court credited the testimony of Special Agent Gonzáles that Appellants had not disclosed everything they knew about the drug smuggling conspiracy -- that while the story proferred by Appellants was consistent, it was "illogical" and "incredible" that an international drug smuggler would place $7.5 million of narcotics on a vessel traveling in international waters without having some type of voluntary control over the vessel's crew. This

testimony is more than a statement of no confidence.  The testimony of Special Agent Gonzáles, based on his years of experience in the field of drug interdiction, provides a sound grounding for the district court's denial of the safety valve.  If there is any error here by the district court, it certainly is not clear.

### 3.  Downward Departure for Duress

Even though the jury rejected Appellants' duress defense, the district court still had the authority to grant a downward departure under the guidelines at sentencing.  U.S.S.G. § 5K2.12; United States v. Sachdev, 279 F.3d 25, 28 (1st Cir. 2002).  "[T]he type and kind of evidence necessary to support a downward departure premised on duress is somewhat less than that necessary to support a defense of duress at trial."  United States v. Amparo, 961 F.2d 288, 292 (1st Cir. 1992).  However, on appeal, we only have jurisdiction to review if "the sentencing court's failure to depart did not represent an exercise of factfinding or discretion, but was instead the product of the court's miscalculation about whether it possessed the authority to depart."  Id.; see also United States v. Teeter, 257 F.3d 14, 30 (1st Cir. 2001) (holding that this Court would not entertain an appeal of a denial of a departure for duress unless it had a reason to believe that the trial court did not understand its options).

This case does not fall within the exception: Appellants do not theorize that the sentencing judge was unaware of his power

to depart or misconceived the legal standard. Instead, Appellants challenge the district court's discretionary decision not to depart. It follows inexorably that we lack jurisdiction to review the assigned error.

### 4. **Booker** Claim

While the instant appeal was pending, the Supreme Court decided United States v. Booker, striking down the provision of the Sentencing Reform Act that made the sentencing guidelines mandatory, and holding that district courts are not bound by the guidelines but must consult them and take them into account when sentencing. 543 U.S. 220, 258, 264 (2005). One of the Appellants, Isaa, now claims that he is entitled to a remand for resentencing pursuant to Booker because he was sentenced under the mandatory guidelines and the court did not consider, as required, all the sentencing factors enumerated in 18 U.S.C. § 3553(a).

If Isaa was sentenced under a mandatory guidelines system, we will "remand for resentencing where 'either in the existing record or by plausible proffer, there is a reasonable indication that the district judge might well have reached a different result under advisory guidelines.'" United States v. Lewis, 406 F.3d 11, 21 (1st Cir. 2005) (quoting United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005)). Isaa, however, was not sentenced under a mandatory guidelines system. Rather, he was sentenced to a statutory mandatory minimum of 120 months of

imprisonment for intending to distribute more than 1000 kilograms of marijuana, pursuant to 21 U.S.C. § 960(b)(1)(G). Accordingly, Isaa does not have a cognizable Booker claim. "A mandatory minimum sentence imposed as required by a statute based on facts found by a jury or admitted by a defendant is not a candidate for Booker error." United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005); United States v. Bermúdez, 407 F.3d 536, 545 (1st Cir. 2005) ("Since Bermúdez was sentenced to a statutory mandatory minimum, rather than an erroneously mandatory guideline amount, no Booker error occurred.").

### III. Conclusion

For the reasons stated above, we affirm in part and reverse in part, remanding in accordance with this opinion.

**Affirmed in part, Reversed in part and Remanded**.