LYNCH, Chief Judge.
Responding to the “serious international problem” of maritime drug smuggling, 46 U.S.C. § 70501, Congress enacted the Maritime Drug Law Enforcement Act (“MDLEA”) in 1980. Congress intended the MDLEA to address this “specific threat to the security and societal well-being of the United States,” id., by providing for the enforcement of our drug laws outside the territorial jurisdiction of the United States, id. § 70503(b). In particular, the MDLEA expanded the drug enforcement jurisdiction of the United States to include, inter alia, vessels “registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States.” Id. § 70502(c)(1)(C). Appeals from prosecutions in the District of Puerto Rico under the MDLEA for drug trafficking in the Caribbean are frequent in this court. See, e.g., United States v. Vilches-Navarrete, 523 F.3d 1 (1st Cir.2008); United States v. Cardona-Sandoval, 518 F.3d 13 (1st Cir.2008) (per curiam); United States v. Rodríguez-Durán, 507 F.3d 749 (1st Cir.2007); United States v. Gil-Carmona, 497 F.3d 52 (1st Cir.2007); United States v. Bravo, 489 F.3d 1 (1st Cir.2007).
In this case, the U.S. Coast Guard intercepted a shipment of 400 kilograms of *5 cocaine and 25 kilograms of heroin — worth several million dollars — onboard a boat traveling from Colombia to the Dominican Republic. A jury convicted the captain and three crewmen from that boat both of aiding and abetting drug possession with intent to distribute and of a related conspiracy charge in federal court in Puerto Rico. That same jury acquitted three other crewmen. Another crewman was tried and convicted separately.
The convicted defendants’ sentences ranged from 360 months’ imprisonment for the captain to 151 months’ imprisonment for two of the crew members. On appeal, defendants challenge the sufficiency of the evidence offered in support of those convictions, along with various other aspects of their trial and sentences. We affirm.
I.
On February 4, 2007, the Coast Guard cutter Tahoma was patrolling in international waters approximately 100 miles north of the South American shoreline along the border between Colombia and Venezuela. It came upon the Osiris II, a 120-foot Bolivian flag vessel, sitting dead in the water.
This was not the Coast Guard’s first encounter with the Osiris II. In November 2006, the Coast Guard boarded the Osiris II when the boat was experiencing engine problems after leaving Colombia en route to the Dominican Republic. The Coast Guard diverted the Osiris II to Puerto Rico, where it inspected the boat for drugs using dogs and divers. Although the Coast Guard did not then find any drugs onboard, it considered the Osiris II a “suspect” vessel.
This time, the Osiris II again appeared to be having propulsion problems. The crew of the Tahoma contacted the Osiris II to offer assistance. The Osiris II’s captain, defendant Eusebio Estupinan-Estupinan, explained that his boat’s main engine was not working. He initially declined the Coast Guard’s offer of help, saying that a tugboat was on its way. But after the Coast Guard explained that it had mechanics onboard who could look at the boat’s engine, Estupinan-Estupinan accepted the Coast Guard’s offer and invited the Tahoma’s crew to board his vessel. Before boarding, the Coast Guard obtained permission from the Bolivian government under the MDLEA to board and search the Osiris II.
Once onboard, the Coast Guard’s boarding team performed an initial safety inspection. Finding no safety hazards, they then did an at-sea space accountability assessment of the vessel. The purpose of this search was to ensure that the boat did not contain any contraband or firearms.
The Coast Guard searched the Osiris II over the course of several days. Estupinan-Estupinan remained in the pilot house while the boarding team conducted its search. The other seven members of the Osiris II’s crew — including defendants Alberto Angulo — Hernández, Gustavo Rafael Brito-Fernández, and José Luis Casiano-Jiménez — stayed on the main deck, where they were guarded by two members of the boarding team.
While searching a closet onboard the Osiris II, Coast Guard petty officer Sean Andrus discovered a kilogram of a tannish powder in a trash bag. The substance field-tested positive for heroin. At trial, however, the parties stipulated that subsequent laboratory testing revealed that the powder was not a controlled substance. Andrus secured the area and gathered the Osiris II’s crew in one of the boat’s staterooms. Although he did not then disclose his discovery to the Osiris II’s crew, Andrus observed that they appeared “a little bit nervous at that point in time.” And *6 the longer that the Coast Guard spent searching the boat, the more nervous the crew members became. Andrus noted that the crew members appeared especially nervous when, several days later, he and his team searched the rear portion of the boat.
Searching further, Andrus found a small bag of what appeared to be cocaine and a tan leafy substance, which field-tested positive for heroin, in the engineer’s stateroom. The boat’s engineer was defendant Angulo-Hernández. Again, the parties stipulated at trial that subsequent laboratory testing showed that these items were not controlled substances.[1]
Having already found smaller quantities of substances that field-tested positive for cocaine and heroin onboard the Osiris II, Andrus continued to search the boat for a larger drug stash. He had suspected that the boat’s primary purpose was to smuggle drugs because its legitimate cargo — 28,011 rolls of toilet paper, 207 Styrofoam coolers, and 14 pieces of office furniture, which according to the boat’s invoice were together worth approximately $25,000 — was, in his view, insufficient to make the voyage profitable. Beyond that, the boat’s cargo was not stored in a manner consistent with the practices on a typical commercial vessel. Instead of being stored neatly in boxes or on pallets, the cargo, including some of the toilet paper, was left free to move around the cargo hold, potentially making the boat unstable and threatening to destroy the value of the cargo.
On February 9, 2007, only one portion of the boat remained for the Coast Guard to search — a space toward the rear of the vessel around the aft lube oil tank. Andrus attempted to enter this space through the crew’s living quarters. Andrus removed the rubber matting from the floor, revealing a layer of plywood beneath it. The plywood contained a rectangular seam measuring two feet by four feet. When Andrus could not remove the plywood with a crowbar, he cut a hole in the wood, striking the boat’s steel deck four inches below. Andrus then removed two layers of plywood, exposing a metal hatch screwed into the deck with new-looking screws. Upon removing the screws, the hatch lifted up easily from the deck. The space below contained several plastic bags. In one bag, the Coast Guard found a .380-caliber MAC-10 submachine gun, a fourteen-round loaded magazine, and a silencer for that weapon. The other bags contained approximately 400 bricks of cocaine and 25 bricks of heroin. These drugs would have had a street value of approximately $8 million in Puerto Rico.
The boarding team immediately arrested the Osiris II’s entire crew. Andrus testified: “Once we detained them, put them in handcuffs, their mood changed drastically. They seemed dejected. They hung their heads low. They just knew they were caught.” This testimony is a subject of these appeals. The Coast Guard then towed the Osiris II to San Juan, Puerto Rico.
On April 4, 2007, all eight persons on-board the Osiris II were charged in a three-count superseding indictment with (1) conspiracy to possess with intent to distribute the drugs seized from the boat, see 46 U.S.C. § 70506(b); (2) aiding and abetting drug possession with intent to distribute, see 18 U.S.C. § 2(a); 46 U.S.C. § 70503(a)(1); and (3) aiding and abetting possession of a machine gun, see 18 U.S.C. §§ 2(a), 924(c)(1)(B)(ii).
*7 After a six day trial, a jury convicted Angulo-Hernández, Estupinan-Estupinan, Brito-Fernández, and Casiano-Jiménez on all three counts. The jury acquitted the other three crew member co-defendants. The eighth crew member of the Osiris II was tried separately and convicted on all three counts. At sentencing, the district court granted a judgment of acquittal as to the gun possession charge for each defendant. Defendants timely appealed from their convictions. Angulo-Hernández and Estupinan-Estupinan also contest their sentences on appeal.
II.
A. Sufficiency of the Evidence
All defendants challenge the sufficiency of the evidence. Where, as here, the defendant has preserved his sufficiency challenge by moving for a post-verdict judgment of acquittal, our review is de novo. United States v. Carrasco, 540 F.3d 43, 49-50 (1st Cir.2008). We review the evidence in the light most favorable to the government, drawing all reasonable inferences consistent with the jury’s verdict. Id. at 50. “If a reasonable jury could have found that the government had proven each element of the crime beyond a reasonable doubt, we will affirm the conviction.” Id. We do not atomize our analysis. “[W]e ‘consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence.’ ” United States v. Lee, 549 F.3d 84, 92 (2d Cir.2008) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir.2000)); see also United States v. Roberson, 459 F.3d 39, 47 (1st Cir.2006).
Defendants argue that they are entitled to a judgment of acquittal because three of their co-defendants were acquitted, even though, they assert, the “evidence presented by the government and the defendants was exactly the same as to all of the seven defendants.” This argument misses the point. The pertinent question is whether a reasonable jury could have found these defendants guilty beyond a reasonable doubt based upon the evidence presented. What the jury ultimately decided as to their similarly situated co-defendants is not relevant. Cf. United States v. Powell, 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (recognizing that review of a sufficiency challenge “should be independent of the jury’s determination that evidence on another count was insufficient”). Even if we were to view this as an inconsistency in the jury’s verdict, which we do not, that is not a basis for overturning a conviction that is sufficiently supported by the evidence. See United States v. DeCologero, 530 F.3d 36, 69 (1st Cir.2008).
Here, the evidence offered was more than sufficient to support each of the defendants’ convictions. To prove guilt on the aiding and abetting drug possession charge, the government needed to show beyond a reasonable doubt that the defendants participated in the drug venture and sought by their actions to make'it succeed. Rodríguez-Durán, 507 F.3d at 758-59. Specifically, a violation of 46 U.S.C. § 70503(a)(1) requires proof that (1) the defendants’ vessel was subject to the jurisdiction of the United States, (2) the material found onboard the boat was a controlled substance, and (3) the defendants knowingly or intentionally possessed the drugs with the intent to distribute them. Rodríguez-Durán, 507 F.3d at 759.
Defendants focus on the third prong, arguing that the government proved only their mere proximity to the drugs, which was insufficient to support their convictions. Of course, a defendant’s mere presence at the scene of the crime alone is generally insufficient proof of his participation in the crime. United States *8 v. Guerrero, 114 F.3d 332, 342 (1st Cir.1997). But this is not a “mere presence” case; the evidence strongly indicates that the convicted defendants knew about the drugs onboard the Osiris II.
The evidence against Estupinan-Estupinan, the boat’s captain, is particularly strong. “[J]uries may reason that a captain normally knows what his ship contains.” Carrasco, 540 F.3d at 50 (alteration in original) (quoting United States v. Steuben, 850 F.2d 859, 865 (1st Cir.1988)). Here, the evidence presented supports this common sense conclusion. For example, the Coast Guard found a sketch of the Osiris II in the captain’s quarters with a mark indicating where the drugs were hidden. And Estupinan-Estupinan initially refused help from the Coast Guard, even though his boat’s engine had failed in the open water. A jury could reasonably infer that his reluctance was motivated by a desire to keep the Coast Guard from discovering the drugs onboard his boat. Moreover, Estupinan-Estupinan did not run his boat in a manner consistent with a commercial shipping operation. The boat’s legitimate cargo was carelessly stowed in the hold, potentially compromising both the stability of the boat and the integrity of the cargo.[2] Based upon the evidence presented, a reasonable jury could easily have found that Estupinan-Estupinan knew there were drugs on his boat.
The government also presented sufficient evidence to sustain the convictions against crew members Brito-Fernández and Casiano-Jiménez. Supporting factors may include “the length of the voyage, the size and condition of the vessel, the quantity of [drugs aboard], and the absence of a legitimate purpose for the voyage.” Carrasco, 540 F.3d at 50 (alteration in original) (quoting Guerrero, 114 F.3d at 342). Here, the Osiris II was on a voyage between Colombia, a primary source of drugs, and the Dominican Republic. A large quantity of drugs was seized from a hidden compartment accessible through the crew’s berthing area. The quantity of drugs seized itself suggests strongly that each of the crew members knew about the boat’s drug smuggling purpose because “drug traffickers would not entrust a multi-million-dollar shipment to anyone in whom they did not have confidence.” Rodríguez-Durán, 507 F.3d at 760; see also Guerrero, 114 F.3d at 344 (“[U]nwitting bystanders would not have been hired to participate in the [boat’s] obvious illegal transport of millions of dollars’ worth of contraband”); United States v. Piedrahita-Santiago, 931 F.2d 127, 131 (1st Cir.1991); United States v. Cuevas-Esquivel, 905 F.2d 510, 515 (1st Cir.1990) (“It is entirely reasonable for the jury to conclude the conspirators, engaged in conduct which by its nature is kept secret from outsiders, would not allow the presence of innocent bystanders.”). And the practical difficulties involved with concealing such a quantity of drugs makes it unlikely that the crew members were unaware of the drugs onboard the boat. See Carrasco, 540 F.3d at 51.
Beyond that, the screws on the hatch leading to that compartment were not tarnished, indicating that the space had been sealed shut recently. This evidence is probative of the crew members’ knowledge of the drugs because the more recently that the drugs were placed onboard the boat, the more likely it is that the crew members either witnessed the loading or participated in it.
*9 Finally, a reasonable jury could have concluded that the crew members knew the purported legitimate purpose of the voyage was a ruse, given the self-evident low value of the cargo and the unprofessional manner in which it was transported. Indeed, as even the defendants’ only witness acknowledged, the toilet paper was stored in a manner that could have destroyed its value, making it obvious that the boat’s primary purpose was something other than delivering toilet paper. The evidence in total was sufficient for a jury to conclude the crew members knew of the Osiris II’s drug smuggling purpose.
The evidence demonstrating the other crew members’ guilt applies with equal force to Angulo-Hernández, the boat’s engineer. But one additional fact makes the government’s case against Angulo-Hernández even stronger. Angulo-Hernández had been on a previous crew list for the Osiris II, making it even more unlikely that he was unaware of the boat’s secret compartment and its contents. His sufficiency claim also fails.
Likewise, because the jury could have found that each defendant had knowledge of the drugs onboard the Osiris II, it could have inferred that they had agreed to transport the drugs for the purpose of distributing them at their destination, which is the essence of the conspiracy charge. See Carrasco, 540 F.3d at 51.
B. Lay Opinion Testimony
All defendants challenge the admission of Andrus’s testimony regarding the crew’s demeanor when they were arrested. Specifically, Andrus testified: “Once we detained them, put them in handcuffs, their mood changed drastically. They seemed dejected. They hung their heads low. They just knew they were caught.” Defendants argue that Andrus’s statement was not properly admissible as a lay opinion under Fed.R.Evid. 701.
Even assuming without deciding that Andrus offered an improper lay opinion, any possible error was harmless. A non-constitutional evidentiary error is harmless if it is “highly probable that the error did not influence the verdict.” Roberson, 459 F.3d at 49 (quoting United States v. Flemmi, 402 F.3d 79, 95 (1st Cir.2005)). Here, the district court immediately clarified that Andrus’s statement should be interpreted as a statement about the defendants’ visible frustration at the situation, which is a permissible subject of lay opinion testimony. See 29 Wright & Gold, Federal Practice and Procedure § 6255, at 160 (1997) (“[L]ay opinion traditionally has been received as to the mental, emotional or physical condition of a person observed by the witness.”). The district court then minimized the force of Andrus’s statement by stating that it was merely Andrus’s interpretation of the situation. These efforts, coupled with the weight of the evidence against the convicted defendants, convince us that any error that may have occurred here was harmless.
C. The District Court’s Questioning of Witnesses and Commentary During the Trial
Each of the four defendants complains that he was seriously prejudiced by various instances of the district court’s questioning of witnesses and commentary during the trial.[3] They argue that the district *10 court’s participation in trial demonstrated a bias in favor of the government. On balance, we reject their arguments.
“[A] trial judge in the federal system retains the common law power to question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence.” Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir.1997). Yet there are limits on this power. “[T]he judge’s participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly.” Id. “With allegations of judicial bias, we consider whether the comments were improper and, if so, whether the complaining party can show serious prejudice.” DeCologero, 530 F.3d at 56.
We have carefully evaluated whether the court’s rather frequent questioning and commentary crossed the line. These incidents of alleged improper participation were, on the whole, efforts by the district court to clarify testimony, respond to defense counsels’ objections, determine the qualifications of expert witnesses, and expedite the trial, all legitimate purposes.
We also note that the district court instructed the jury at the outset of trial that
I am not here to lead you into a particular result. I am not here to insinuate to you or tell you what your answer should be to the factual questions of the case. So you should disregard any comment that I may make, anything that I may do or say that has nothing to do with rulings or with the applicable law.
Cf. Logue, 103 F.3d at 1046-47 (explaining that jury instructions may be “sufficient to palliate any untoward effects” of the district court’s participation in the trial). While district courts must be cautious about such intrusions, we find no prejudicial error here.
D. Constitutional Challenge to Jurisdiction Under the MDLEA
Angulo-Hernández and Casiano-Jiménez argue that the MDLEA is unconstitutional. As best we can tell, their argument is that due process requires that the government prove a jurisdictional nexus between the defendants’ criminal conduct and the United States. That argument has been rejected by this court for at least a decade. “[D]ue process does not require the government to prove a nexus between *11 a defendant’s criminal conduct and the United States in a prosecution under MDLEA when the flag nation has consented to the application of United States law to the defendants.” United States v. Cardales, 168 F.3d 548, 553 (1st Cir.1999). And the MDLEA itself contains no jurisdictional nexus requirement. Bravo, 489 F.3d at 7.
Here, the Coast Guard complied with the MDLEA’s jurisdictional requirements by obtaining consent from the Bolivian government to enforce the laws of the United States against those onboard the Osiris II. See 46 U.S.C. § 70502(c)(1). This was proven in court through a certificate from the U.S. State Department. See id. § 70502(c)(2) (“Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States ... is proved conclusively by certification of the Secretary of State or the Secretary’s designee.”). The defendants’ jurisdictional challenge is meritless.
Defendants also argue on appeal that the MDLEA violates the Confrontation Clause because it allows jurisdiction under the statute to be proven conclusively through a certificate from the State Department without allowing the defendants an opportunity to cross-examine the certifying declarant. See id. § 70502(c)(2)(B). Jurisdiction under the MDLEA is not an element of the offense; it is a “preliminary question[ ] of law to be determined solely by the trial judge,” id. § 70504(a); see also Vilches-Navarrete, 523 F.3d at 20.
Here, the prosecution asserted that there was jurisdiction under the MDLEA through a motion in limine, which included the State Department’s certificate as an attachment. The prosecution’s motion recognized that jurisdiction under the MDLEA is “not an issue that should be litigated during trial or before the jury.” The district court agreed and ultimately rejected, before trial, the defendants’ jurisdictional challenge.
Despite this ruling, defendants persisted at trial in contesting the district court’s jurisdiction under the MDLEA, arguing that the State Department’s certificate lacked sufficient indicia of reliability. In response, the government offered the State Department’s certificate as a trial exhibit, which the district court accepted over the defendants’ hearsay objection. Defendants did not object on Confrontation Clause grounds.
The district court later instructed the jury that “as a matter of law, ... the Motor Vessel Osiris II was subject to the jurisdiction of the United States.” Following that instruction, defendants renewed their objection to giving the jury a copy of the State Department’s certificate, presumably on the same ground of inadmissible hearsay. The district court overruled their objection. Defendants again never objected to the admission of the State Department’s certificate under the Confrontation Clause. Our review of their newfound appellate claim is for plain error. United States v. Ziskind, 491 F.3d 10, 14 (1st Cir.2007). To meet the plain error standard, defendants must show: “(1) the occurrence of an error; (2) that the error is obvious or clear under current law; (3) that the error affected [their] substantial rights; and (4) that it seriously impaired the fairness, integrity, or public reputation of the judicial proceedings.” Id.
There was no plain error in the admission of the State Department’s certificate. To start, the certificate was relevant to the jurisdictional issue before the court. It was admissible under the hearsay exception for public records, see Fed.R.Evid. 803(8), and was self-authenticating, see Fed.R.Evid. 902(1). There was no need to publish it to the jury; defendants *12 brought that on themselves by trying to raise the certificate as an issue at trial.
We seriously doubt that defendants can mount a Confrontation Clause challenge to the admission of the State Department’s certificate. Any cross-examination of the certifying declarant would have been irrelevant because the State Department’s certificate conclusively proved jurisdiction under the MDLEA. See 46 U.S.C. § 70502(c)(2)(B). For purposes of plain error review, we do not decide the Confrontation Clause question because the “error” alleged by defendants was not “obvious or clear under current law,” Ziskind, 491 F.3d at 14. Defendants have cited no case which holds that a State Department certificate is testimonial within the meaning of the Confrontation Clause. Indeed, the caselaw is to the contrary. See Pandales-Angulo v. United States, No. 01-CR-294-T-17MSS, 2006 WL 1540259, at *5 (M.D.Fla. May 31, 2006).
E. Denial of Request for Continuance
Casiano-Jiménez challenges the district court’s denial of his multiple requests for a continuance. The essential argument is that the holding of trial within three months of his initial indictment was too fast to allow him to mount a defense. Our review is for abuse of discretion. DeCologero, 530 F.3d at 78-79. “We grant ‘broad discretion’ to a trial court to decide a continuance motion and will only find abuse of that discretion with a showing that the court exhibited an ‘unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.’ ” United States v. Rodriguez-Marrero, 390 F.3d 1, 21-22 (1st Cir.2004) (quoting United States v. Rodriguez Cortes, 949 F.2d 532, 545 (1st Cir.1991)).
Casiano-Jiménez and his co-defendants filed five motions for a continuance because, in them view, “there had not been enough time to verify the discovery announced by the prosecution [or] to carefully examine, analyze and obtain evidence needed for an adequate defense.” Specifically, Casiano-Jiménez wanted additional time to obtain “a certification by the Embassy of Bolivia to the fact that on February 4, 2007 it had not authorized the boarding by the U.S. Coast Guard.”
On March 30, 2007, the government provided defendants with the State Department’s certification of Bolivia’s statement of no objection, which conclusively proved the Coast Guard’s authority to board the Osiris II. See 46 U.S.C. § 70502(c)(2)(B). The defendants’ trial did not start until May 7, 2007. Casiano-Jiménez has failed to explain how any additional time would have allowed him to challenge this document, and we find no abuse of discretion in the district court’s decision to proceed with the trial as scheduled. See Rodríguez-Durán, 507 F.3d at 766-67 (rejecting a nearly identical challenge to a denial of a motion for a continuance).
F. Fair Cross-Section Challenge
Angulo-Hernández argues that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community because a substantial percentage of the population in Puerto Rico lacks the English language proficiency required to serve on a federal jury. We have rejected this argument before. See United States v. Rodriguez-Lozada, 558 F.3d 29, 38 (1st Cir.2009); United States v. González-Vélez, 466 F.3d 27, 40 (1st Cir.2006); United States v. Dubón-Otero, 292 F.3d 1, 17 (1st Cir.2002). Even if we were not bound by precedent, we would reach the same result.
G. Sentencing Issues
Angulo-Hernández and Estupinan-Estupinan challenge their sentences. An *13 gulo-Hernández, the boat’s engineer, received 292 months’ imprisonment, a sentence at the low end of his Guidelines Sentencing Range (“GSR”). Estupinan-Estupinan, the boat’s captain, received 360 months’ imprisonment, a sentence in the middle of his GSR.
Estupinan-Estupinan and Angulo-Hernández both argue that their sentencings were procedurally defective because the district court did not explain on the record its reasons for selecting the sentences it chose. Yet explicit reasons are not needed where “a court’s reasoning can ... be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did.” United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir.2006) (en banc). Here, we can infer that the district court’s sentencing decision was motivated in large part by the seriousness of the offense — a multi-million dollar drug smuggling operation involving a machine gun. And in any event, the district court provided an explanation for Estupinan-Estupinan. It said that it chose 360 months for Estupinan-Estupinan because he had two prior drug crime convictions.
Angulo-Hernández and Estupinan-Estupinan also challenge the substantive reasonableness of their sentences. We review the substantive reasonableness of their sentences under an abuse of discretion standard, considering the totality of the circumstances. United States v. Gibbons, 553 F.3d 40, 47 (1st Cir.2009).
Estupinan-Estupinan argues that his sentence was unreasonably harsh given his age; he was 62 years old at the time of his sentencing. The district court found this factor was outweighed by the severity of Estupinan-Estupinan’s current offense and history of drug crimes. “We will not disturb a well-reasoned decision to give greater weight to particular sentencing factors over others,” id., and the district court here did not abuse its discretion in choosing not to exercise leniency in light of Estupinan-Estupinan’s age.
Angulo-Hernández argues that his sentence was unreasonable because his co-defendant crew members received only 151 months’ imprisonment and at least one of them has a criminal record similar to his. But Angulo-Hernández did not present this argument about a sentencing disparity to the district court, and our review is for plain error. United States v. King, 554 F.3d 177, 180 (1st Cir.2009). There was no error here, let alone plain error. The evidence presented at trial indicated that Angulo-Hernández likely had a more substantial role in the conspiracy than his crew member co-defendants, given that his name appeared on a previous crew list. Because of this difference, we cannot say that Angulo-Hernández received a disparate sentence.
III.
The defendants’ convictions and sentences are affirmed.

. Unfortunately, the government’s brief to us misrepresented the evidence presented at trial, saying that “drugs — cocaine and heroin'— were found in two (2) of the staterooms, including the engineer’s stateroom.” The stipulation at trial contradicts this assertion.

. Other items seized from the boat suggest that Estupinan-Estupinan was not running a legitimate business. For example, Estupinan-Estupinan kept his captain’s log in a child's notebook, which had trucks on the cover and the title "Super Trucks.”

. To give a few examples, defendants argue that the district court improperly commented on Andrus’s testimony regarding the change in the crew members' moods upon their arrest. Specifically, when responding to defense counsels' objection to Andrus's testimony on the basis that he lacked personal knowledge of the crew members' moods, the *10 district court said: "Well, obviously, he was the one who caught them. So how can you say that? The mood changed drastically.”
Later, on cross-examination, defense counsel asked Andrus: "So your main objective that afternoon ... was not to go help the captain with the mechanics of the vessel? Yes or no?” Andrus responded: "I can’t answer that yes or no, sir. I have to explain it.” When defense counsel persisted in trying to make Andrus give a yes or no answer, the district court said to Andrus: "There is no question about the fact that your mission was not necessarily being a Good Samaritan. You had a law enforcement mission.” Andrus replied: "Yes, sir.” The district court then said: "There you go.”
Defendants also claim that the district court frequently interrupted the testimony of their only witness, José L. Rivera, a harbor pilot. In particular, when the government was cross-examining Rivera regarding the common practices for storing cargo on a boat, the following exchange occurred:
THE COURT: Isn’t it a fact that, usually, this kind of commodity is packed in cardboard boxes or in pallets? Otherwise, you are going to ruin it.
THE WITNESS: Well, Your Honor, they normally come in — from what we see in the United States, they come in boxes. This one is wrapped in, obviously, plastic. So it could have been that one of the packets opened or ruined and the other stuff was loose and unprotected.
THE COURT: It is not the typical arrangement you would find a commercial cargo intended for commercial purposes?
THE WITNESS: No.